**Eric R. TINNERHOLM, an infant under the age of fourteen years, by his Guardian ad Litem, Carl F. Tinnerholm, and Carl F. Tinnerholm, Individually, Plaintiffs,**

v.

**PARKE DAVIS & CO., Defendant.**

**No. 62 Civ. 4006.**

United States District Court
S. D. New York.

May 15, 1968.

---

Fuchsberg & Fuchsberg, New York City, Jacob D. Fuchsberg Richard E. Shandell, New York City, of counsel, for plaintiffs.

Costello, Ward, Tirabasso & Shea, New York City, Joseph M. Costello, New York City, David C. Dethmers, Detroit, Mich., of counsel, for defendant.

TENNEY, District Judge.

This product liability case, which was tried to this Court without a jury, involves the ethical drug Quadrigen, made by defendant Parke Davis & Co., and administered to the infant plaintiff herein. Quadrigen contains four antigens:[1] diphtheria toxoid, tetanus toxoid, pertussis (whooping cough) vaccine and poliomyelitis vaccine. The action has been brought on behalf of the infant plaintiff by his father, and by the father individually, charging negligence in various respects and breach of an express and implied warranty. There is no dispute that the injuries suffered by the infant plaintiff are catastrophic.

The plaintiff, Eric Tinnerholm, was born on August 30, 1959, in Huntington Station, Long Island, New York. He was the third child born to his parents, the plaintiff Carl F. Tinnerholm and Mrs. Tinnerholm, the other two children then being five and four years of age. His birth was normal, as was his mother's pregnancy, and at the end of the first and second months of his life he was taken to the family physician, Dr. Gerald Feinberg, for routine check-ups. The infant was apparently a big, healthy boy who ate and slept well and was active and alert.

Some time between 11:00 A.M. and noon on Saturday, November 28, 1959, Mrs. Tinnerholm, by prearrangement, took Eric to Dr. Feinberg's office for his first immunization injection. She was informed that this immunization was not the usual 3-in-1 that her other children had received, but that it was a 4-in-1 which added poliomyelitis vaccine to the antigens with which she was already familiar. Eric suffered no immediate side-effects following the injection and continued in apparent good health through that Saturday and Sunday. On Monday he appeared extremely quiet and seemed to look toward the wall most of the day, although the parents apparently thought nothing of this at that time. On Tuesday morning, December 1, 1959, at about 4:00 A.M., the child was found tangled up in his bedclothes and whimpering, but on being picked up and patted he quieted down and presumably went back to sleep. There was no indication of temperature at that time. However, some time later, between 6:30 and 7:00 A.M., the child was found by his mother huddled under the covers, lethargic and bathed in perspiration. His temperature at that time was 108°, he was very white, his lips were blue, and he was limp. While Mrs. Tinnerholm gave the child an alcohol bath, Dr. Feinberg was summoned by the boy's father.

When the doctor arrived around 7:30 A.M. he confirmed the 108° temperature which was shortly reduced to 106° by the alcohol bath. The doctor's examination further disclosed a small amount of emesis and some coughing. The remainder of the examination was negative.

[1]. An antigen is a substance which causes antibodies to be produced by the organism into which it is injected.

Eric was admitted to Huntington Hospital at 8:45 A.M. where he was again examined by Dr. Feinberg who found the child's neck supple, an absence of masses, and a negative Brudzinski.[2] Dr. Feinberg's original diagnosis was fever of unknown origin. Eric remained in Huntington Hospital until December 18th, during which period he was cared for by two pediatricians, Doctors Gordon and Kagan, and also examined by a neurologist, Dr. Sengstaken. Dr. Kagan examined the boy on the day of his admission to the hospital and found him to be pale, hyperpneic,[3] the eyes dull and apathetic, with focal seizures and twitching of the right side. There was a dullness and loss of landmarks in the ears and some redness at the back of the throat. On the basis of his examination, Dr. Kagan believed that the boy had either a bacterial infection of the bloodstream (sepsis) or meningitis. However, subsequent laboratory testing ruled out both the sepsis and meningitis, for a spinal culture revealed clear fluid with only three cells, a normal finding indicating the absence of infection. There was, however, an elevated protein content of 100 milligrams per cent, indicating some abnormality attacking the brain. A repeat lumbar puncture ten days after admission again showed an absence of cells and a protein content of 56 milligrams per cent, lower than the previous 100 milligrams per cent, but still above normal. During this first hospitalization Eric developed recurrent seizures, and on the fifth day a flaccid paresis or paralysis of the right arm and leg was noted and which persisted until his discharge on December 18, 1959. Since that time he has been retarded in his mental development, being classified in the imbecile-idiot range. He is unable to stand or walk or talk, is incapable of toilet training, and in order for him to be able to sit he must first be propped up. There is a spasticity in posturing of the right upper limb and the right lower limb, indicating a spastic weakness of these extremities. He still suffers occasional seizures and has a mental age in the range of five months.

Is it possible to determine, with reasonable medical certainty or reasonable medical probability, that something peculiar to Quadrigen was the proximate cause of the injuries suffered by the infant plaintiff? The question must be answered affirmatively. Dr. Charash, one of plaintiffs' experts, concluded that the child suffered a pertussis-vaccine encephalopathy,[4] basing his conclusion on the temporal relationship between the immunization and the onset of illness; the unusual and spectacular sudden rise and subsequent rapid reduction in temperature; the appearance of unilateral seizures and weakness; the essentially extraordinary discrepancy between the very high protein and the absence of white cells in the spinal fluid; and the flatness of the fontanel. For the same reasons, he discounted the possibility of a viral encephalitis,[5] one of the possible alternatives raised by defendant. Likewise, the suggestion that the infant may have developed a brain abscess from otitis media is not supported by the evidence. What was it, then, that was peculiar to Quadrigen that it can be stated, with reasonable medical certainty or probability, caused the injuries already described? In order to answer this question it is necessary to discuss in some detail pertussis and pertussis vaccine as incorporated in Quadrigen.

Pertussis, or whooping cough, is a communicable respiratory disease caused by a bacterial organism. The disease may attack the brain to the extent that convulsions, high fever, and occasionally hemorrhages in the brain are produced. Sometimes this is accompanied by

2. A Brudzinski is a neurological test which includes the forward flexion of the neck or the head on the neck which, if done without resistance and without pain, indicates there is no meningeal irritation.

3. Abnormally rapid breathing.

4. Encephalopathy is any degenerative disease of the brain.

5. Encephalitis is an inflammation of the brain.

hemiplegia or paralysis of half the body, and not infrequently there is a resultant mental retardation. The disease is particularly dangerous for children during their first year of life, since little or no maternal immunity is passively transferred to the newborn. Immunity, however, may be obtained through the injection of a vaccine.

A vaccine, by introducing an antigenic factor into the body of the recipient, is intended to stimulate the production of antibodies, which antibodies confer protection against the disease. In the process, lymphocytes, a form of cell contained in the lymph glands, absorb the antigenic factor and produce an antitoxin against the particular disease. With some infectious diseases, such as diphtheria and tetanus, it has been possible in developing a vaccine to isolate the soluble toxin or poison excreted by the bodies of these bacteria, and to inactivate this toxin with formaldehyde, thus converting the toxin into what is called a toxoid. This toxoid preserves the ability to immunize against the disease by stimulating the production of antibodies in the recipient, but it has lost its poisonous qualities.

The pertussis organism, however, is a unique, very complex one containing many different factors. There is an exotoxin, an endotoxin, a protective antigen, a factor that gives the Schwartzman phenomenon,[6] a factor sensitizing to histamine, yeast, protein extracts, vaccines and endotoxin, to infection by gram negative bacteria and by influenza, to X-rays, pressure, the stress of cold, and to a marked degree sensitizing to ceretonium, one of the important neuro-hormones of the brain. The exotoxin in the pertussis organism is thermo labile, i. e., it is destroyed by heat, and all vaccines with which we are concerned are heated during preparation and the thermal labile exotoxin destroyed. However, the endotoxins inside the cell are not destroyed by heat. It is this endotoxin, also called a lipopolysaccharide, to which febrile reaction following administration of pertussis vaccine is usually attributed. In addition to the protective antigen already mentioned, there are some fourteen or fifteen different antigens, and nobody knows which, of all these antigens, is the one which stimulates production of the antibodies conferring protection against pertussis (whooping cough).

By reason of the complexity and mystery of the pertussis organism, it was impossible to isolate the toxin conferring protective activity and make a toxoid out of it, as in the case of diphtheria and tetanus. Therefore, it was necessary to administer the entire bacteria organism, treating it in some way by heat or otherwise to kill the organism but preserve the antigenicity. As a result, whereas there were practically no reactions to diphtheria or tetanus toxoids, there were not uncommonly reactions to pertussis vaccine such as a swollen injection area and some fever. Occasionally, there was severe pain from the site of the injection, and on rare occasions convulsions, high fever and the neurological sequelae of brain hemorrhage, hemiplegia and mental retardation, just as with the disease itself. The cause of these neurological manifestations following the use of pertussis vaccine is not definitely known either on a pathological, histological or clinical basis. These manifestations, however, were first brought to the attention of the medical profession in April of 1948. Thereafter there were developed additional controls over the production of pertussis vaccine. Under the new regulations the encephalopathic type of reaction was minimized. The use of phosphate adjuvants [7] made possible a decrease in the amount of pertussis in the formula; new maximum as well as minimum potency standards were set; and

---

6. The Schwartzman phenomenon is the production of ulcers on injection under the skin of a rabbit.

7. An adjuvant in immunology is any substance that when mixed with an antigen enhances the antigenicity and gives a superior response.

the toxicity of the pertussis component was reduced by extra heating and by the toxicity test. The potency test is performed by injecting groups of mice with varying dilutions of vaccine and, then, after a period of time, challenging the mice with virulent organisms. The toxicity test was performed by injecting a group of ten mice of specified weight with a specified dose of vaccine and weighing the group at specified intervals. I will have further occasion herein to discuss in greater detail the matter of tests as to their adequacy in the present case. Mention has been made above of the use of phosphate adjuvants which permitted a reduction of the amount of pertussis in the formula. Today, at least in American vaccines, an aluminum salt is used as an adjuvant. An adjuvant serves as a depot or button which will slow the release of the antigen rather than having it released all at once when the vaccine is merely suspended in a liquid. When aluminum phosphate was first used, there was some apparent increase in toxicity and the amount of the aluminum phosphate was reduced approximately one-half with a resultant substantial reduction in toxicity. Thereafter vaccines with the aluminum phosphate were no more toxic than other adsorbed vaccines.

One other aspect of the manufacture of pertussis vaccine should be mentioned at this time. All vaccines packed in multi-dose vials require a preservative to keep them sterile (not to preserve their potency). In the development of pertussis vaccines up until the development of polio vaccine the universal preservative used was merthiolate. At the time there was no information that the merthiolate affected the vaccine for better or for worse, but it has recently been discovered that merthiolate acts as a stabilizer of the vaccine, that in its presence the vaccine tends to decrease in toxicity in storage at the same time as its potency is stabilized at a level at least for the first six months.

In the early 1940's, there was developed the method of combining pertussis vaccine with diphtheria and tetanus toxoid into a combined antigen product colloquially known as "DTP". No apparent increase in toxicity or reactivity was noted as a result of such combination. Defendant marketed such a product under the trade name "Triogen".

After the Salk poliomyelitis vaccine was developed, it was decided by defendant to attempt to mix the polio vaccine with the "Triogen" in order to develop commercially a quadruple antigen product. In connection with the development of polio vaccine it had been learned that merthiolate had a deleterious effect upon the polio virus, caused by the action of released mercury ions. Eli Lilly & Company incorporated Versene within its vaccine, which prevented the release of the mercury ions. However, Versene was incompatible with the aluminum phosphate used as an adjuvant by defendant in Triogen, and since defendant anticipated that it would want to develop a vaccine combining the polio vaccine with Triogen, it decided to use benzethonium chloride, or Phemerol, which was defendant's trade name for this product.

Unknown to defendant, the benzethonium chloride had an unusual effect on the pertussis vaccine contained therein. It appears that there was a loss of potency, a reduction in the protective activity of the pertussis vaccine when benzethonium chloride rather than merthiolate was used as the preservative, which loss occurred only when the vaccine was exposed to variations in temperature. While there is no knowledge as to the manner in which benzethonium chloride affects the unidentified protective antigen of the pertussis vaccine, considerable knowledge has been accumulated as to the physical effects of benzethonium chloride on pertussis bacteria placed in a solution including benzethonium chloride. It has been demonstrated that benzethonium chloride partially disappears from the solution during storage, coming down from twenty-five parts per million to only seven parts per million. Benzethonium chloride is a quar-

tenary ammonium compound and has a positive charge, whereas the bacterial cell wall has a negative charge. By attraction, the benzethonium chloride is adsorbed to the cell. Such adsorption on the bacterial cell wall may cause its denaturation and favors the leaching of the toxin from the bacterial cell, resulting in the leakage of the contents of the organism. Certainly, it is reasonable to conclude that the effect of the use of benzethonium chloride was to release the endotoxin from the bacteria cell into the fluid that was injected. One such endotoxin, the lipopolysaccharide, causes fever, and fever can produce convulsions and brain damage. Indeed, fever is one of the recognized etiologies or causes of post-pertussis vaccine encephalopathies.

 It is reasonable to conclude, as I do, with reasonable medical certainty or probability that the release of the endotoxin into the fluid injected into the infant plaintiff was the cause of the unusually high fever which, in turn, caused the severe and permanent brain damage. I find defendant's suggestion that the cause of such damage was a viral encephalitis caused by some unspecified virus, or a sepsis or meningitis, or an allergic reaction, totally unconvincing. It is not plaintiffs' burden to disprove every possible ground of causation suggested by defendant nor must the findings of the Court meet the standards of the laboratorian. Plaintiffs' experts have furnished impressive evidence to support the conclusions reached herein, evidence which has clearly withstood the attack of defendant's experts. Having found Quadrigen to have been the causative factor, I turn now to the question of warranty, express and implied, and the further question of negligence.

*Warranty Generally.*

 Liability for breach of warranty arises where persons or property are damaged because of a product's failure to live up to an express or implied representation by the manufacturer or other supplier. It is distinguished from negligence liability in that it is not based upon fault or upon the failure of such manufacturer or supplier to exercise reasonable care. 2 Frumer & Friedman, Products Liability § 16.01[1] (1967) (hereinafter referred to as "Frumer & Friedman") ; cf. Rheingold, Products Liability—The Ethical Drug Manufacturer's Liability, 18 Rutgers L.Rev. 947, 977 (1964) (hereinafter referred to as "Rheingold").

 An express warranty will arise where a manufacturer, supplier or other seller positively represents a fact concerning the goods he sells. 2 Frumer & Friedman § 16.02; cf. Uniform Commercial Code § 2–313. In the instant case, plaintiffs allege that defendant warranted Quadrigen as "safe, effective and free from harmful side effects * * *." Amended Complt. ¶ 20.[8] An implied warranty, on the other hand, is imposed by operation of law. 2 Frumer & Friedman § 16.02. The implied warranties allegedly breached in the case at bar are the warranties of merchantability and fitness for a particular purpose. Amended Complt. ¶ 28. The warranty of merchantability is that "the thing sold is reasonably fit for the general purpose for which it is manufactured and sold." Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960) ; 2 Frumer & Friedman § 16.04 [2] [d] ; see Burr v. Sherwin Williams Co., 42 Cal.2d 682, 268 P.2d 1041 (1954) ; Twombley v. Fuller Brush Co., 221 Md. 476, 158 A.2d 110 (1960) ; Ryan v. Progressive Grocery Stores, 255 N.Y. 388,

---

8. In paragraph 20 of the amended complaint, plaintiffs also claim that defendant expressly warranted that Quadrigen "was fit for the use as an immunizing agent against various ailments and was of good merchantable quality." These are normally considered to be implied warranties and do not appear to be expressly warranted in the Quadrigen package insert or advertisements to the medical profession. Indeed, in paragraph 28 of the complaint, plaintiffs make these same allegations in their cause of action for breach of implied warranty.

175 N.E. 105, 74 A.L.R. 339 (1931); Rheingold at 978 (reasonable fitness for ordinary purpose for which sold). The implied warranty of fitness for a particular purpose is virtually self-explanatory, the major distinction from the merchantability warranty being reliance on the particular seller's skill and judgment. 2 Frumer & Friedman § 16.04[2] [d]; see Henningsen v. Bloomfield Motors, Inc., supra.

*Privity and Related Problems.*
 *a. Privity.*

The last decade has seen a vigorous frontal assault on the previously near-impregnable "citadel of privity" so that in many states the insulation of the manufacturer of defective goods from direct liability for breach of warranty, express or implied, is a thing of the past. See generally the excellent state-by-state analysis of the privity problem in 2 Frumer & Friedman § 16.04; Kessler, Products Liability, 76 Yale L.J. 887 (1967); Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960).

The decision which provided the impetus for the collapse of privity was Henningsen v. Bloomfield Motors, Inc., supra, wherein the New Jersey Court held that public policy demanded the extinction of the privity doctrine because of mass marketing conditions causing the manufacturer to become remote to the ultimate consumer, sales being accomplished through intermediaries, and product demand being created by use of advertising media. It was obvious, indicated the Court, that the manufacturer contemplated the cultivation of the ultimate consumer and that at least with respect to the purchase of a car, the implied warranty of merchantability should extend to the ultimate purchaser of such vehicle and those persons who would reasonably be anticipated to use it, such as members of the purchaser's family and those occupying or using the vehicle with his consent.

 Of course, no extended discussion is necessary to show that this Court is bound by the New York law of warranty. And it is clear that if the requirement of privity is not dead in this jurisdiction, it has at least been dealt a debilitating blow by the New York Court of Appeals in Greenberg v. Lorenz, 9 N.Y.2d 195, 213 N.Y.S.2d 39, 173 N.E. 2d 773 (1961); Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962); and Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N. Y.S.2d 592, 191 N.E.2d 81 (1963). See generally 2 Frumer & Friedman § 16.04 [2] [b] [x]. In Greenberg v. Lorenz, supra, the Court held that a retailer impliedly warrants the wholesomeness of food and household goods to all members of the buyer's household since a presumption should arise that the purchase was made for all such persons. Randy Knitwear, Inc. v. American Cyanamid Co., supra, dispensed with the requirement of privity in an express warranty case. Frumer & Friedman point out that the real importance of *Randy Knitwear* was that it paved the way for the New York Courts to abrogate privity as a requirement in implied warranty cases since the Court noted (1) a trend away from privity; (2) privity was an outmoded technical rule; (3) that the separate indemnity actions required by the privity rule were a waste of time spent in litigation (obviously both on the part of the courts and the various parties who would be involved); and (4) that warranty was historically a tort action. Id. at § 16.04[2] [b] [x]. Finally, in Goldberg v. Kollsman Instrument Corp., supra, the New York Court of Appeals went about as far as *Henningsen* by holding that an airplane assembler could be liable for the death of an airplane passenger under an implied warranty theory. It was held, however, that the manufacturer of a component part was not liable since "adequate protection is provided for the passengers by casting in liability the airplane manufacturer which put into the market the completed aircraft." 12 N.Y.2d at 437, 240 N.Y.S.2d

at 595, 191 N.E.2d at 83.[9] It is apparent that the refusal to hold the component part manufacturer was not because of lack of privity. 2 Frumer & Friedman § 16.04[2] [b] [x].

From the foregoing, it should appear obvious in the instant case that privity presents no bar to recovery.[10]

### b. Necessity of a Sale.

In Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954), the Court held that a hospital administering a blood transfusion is rendering only a service and is not making a sale. Whether a sale is necessary to impose warranty liability today is questionable (see 1 Frumer & Friedman § 19.02; Rheingold at 974), but even assuming such a requirement, it is submitted that Perlmutter would not bar a recovery in the instant case. Faced with the argument that cases such as Perlmutter would prevent recovery, in Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602, 6 Cal. Rptr. 320 (1960), the live-polio vaccine case, the California Court stated:

> "Clearly it is the patient, and not the doctor, who is the ultimate consumer of the vaccine. While a sale is essential to impose liability under the implied warranties, the initial sale to distributor or retailer of pharmaceuticals is sufficient to impose upon the manufacturer the responsibility of fulfilling the implied warranties which run to the benefit of the persons whom the manufacturer intended to be, and who in fact became the 'consumers'." Id. at 605, 6 Cal.Rptr. at 324.

 The Cutter rationale is a sound one. Moreover, the case at bar is dis-tinguishable from Perlmutter (as was Cutter). Similarity would have been present if the physician who had administered the vaccine to Eric Tinnerholm had been sued for breach of warranty. See 3 Frumer & Friedman § 33.02[b]. Under the law as it existed at that time, plaintiffs would possibly have been denied any recovery. But the later decisions of the New York Court of Appeals in Greenberg v. Lorenz, Randy Knitwear, Inc. v. American Cyanamid Co., and Goldberg v. Kollsman Instrument Co. would allow a direct recovery against the manufacturer, a result not inconsistent with Perlmutter. Accordingly, I find that even if the technical requirement of a sale is necessary, such requirement has been fulfilled under the Cutter Laboratories decision and Perlmutter presents no obstacle to recovery.

With these hurdles cleared, I turn to a consideration of the warranty causes of action.

### Express Warranty.

The package insert (Plaintiffs' Exh. 1) which was apparently sent to the administering physician with his purchase of Quadrigen stated that:

> When given in accordance with suggested methods, local and systemic reactions following the administration of Quadrigen are usually mild. The incidence is usually no greater than is normally experienced with trivalent vaccine. Local reactions and fever of short duration may occur, however, and parents should be cautioned not to apply local treatment, such as wet dressings or heat. Any child who shows a febrile reaction should be kept

9. For an apparent extension of Goldberg v. Kollsman Instrument Corp., see Rooney v. S. A. Healy Co., 20 N.Y.2d 42, 281 N. Y.S.2d 321, 228 N.E.2d 383 (1967), where the defendant supplier sold used protective masks to the City of New York. The Court of Appeals held defendant had breached the implied warranty of merchantability since the defect was in design.

10. Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602, 6 Cal.Rptr. 320, 79 A.L.R. 2d 290 (1960), used a novel but valid approach to solve the privity problem. The reasoning of the Gottsdanker Court was that both food and drugs are intended for human consumption and that such consumption is one of the basic reasons for the food exception. Therefore, the courts should extend the exception to drugs. Of course, in light of the New York cases cited supra, there is no need to resort to the Gottsdanker reasoning herein. See generally 3 Frumer & Friedman § 33.02 [2] [a]; Rheingold at 978.

quiet, should be offered water repeatedly and may be given one or more doses of aspirin as indicated. Occasionally, a residual induration or circumscribed nodule may persist for a week or more.

In instances of more marked reaction, the immunization may be completed with monovalent antigens or other combinations of antigens.

Local reactions have been known to be more severe when the child is in the incubative stage of pertussis. Encephalitic symptoms occasionally occur with acute pertussis though rarely with the use of the prophylactic vaccine. Such severe symptoms of the central nervous system include convulsions and lethargy. They may be followed by mental or physical manifestations, sometimes permanent, or even by death; but fortunately such reactions are extremely rare.

Whether this statement establishes an express warranty and a breach thereof need not be reached herein, for it is clear, as will be hereinafter developed, that the defendant has breached a warranty implicit in the package insert. However, certain of the problems which need be considered in express warranty causes of action will be briefly discussed. Discussion of the sufficiency of the warning will be reserved for that portion of this opinion wherein the negligence issues are considered.

The unique characteristic of drug-product-liability litigation is that while the product is actually meant for the patient, the sales pitch is made to the physician in an attempt to get him to prescribe a particular product or course of treatment to the ultimate consumer. Rheingold at 976. Thus, advertising will take the form, among other things, of promotional literature to the physician, statements of "detail" men who solicit purchases by the physician, package inserts, labels and the like, and/or articles in medical journals. Id. at 965. Can liability of the manufacturer be sustained even though the consumer has not relied on any representation? One New York decision has held that the physician is an agent of the patient for the special purpose of receiving statements from the manufacturer. Wechsler v. Hoffman-La Roche, Inc., 198 Misc. 540, 99 N.Y.S.2d 588 (Sup.Ct.1950). A number of commentators have expressed the view that the representation need not be made directly to the injured consumer. See, e. g., 2 Frumer & Friedman § 16.04[4]; 2 Harper & James, Torts § 28.7 (1956); Rheingold at 976–77. Nevertheless, if direct communication is dispensed with, it would appear that a plaintiff must still prove reliance by the physician. See id. at 977.

Dr. Feinberg, the administering physician, testified that he had read the package insert (TR 610, 616). According to him, it presented no more than he had already been taught in his formal medical education and in his practice (TR 460–63, 617). But, as will be discussed *infra*, the evidence clearly indicates the greater incidence of febrile reactions resulting with the use of Quadrigen, so that the statement as it appears in the package insert is incorrect. Moreover, the statement regarding encephalitic reactions is, at the very least, an ambiguous one (TR 610–18).

However, whether these statements can be properly characterized as express warranties which were breached need not be reached in light of my subsequent decision with respect to the implied warranty of merchantability.

*Implied Warranty.*

In Picker X-Ray Corp. v. General Motors Corp., 185 A.2d 919, 922 (D.C.Mun. Ct.App.1962), it was stated that:

Implied warranty recovery is based upon two factors: (a) The product or article in question has been transferred from the manufacturer's possession while in a "defective" state * * *; and (b) as a result of being "defective" the product causes personal injury or property damage.

The critical problem, then, becomes the meaning of the word "defective". One

commentator has attempted to distinguish between pure and impure drugs, the former being "those sold as the manufacturer intended, but with the harm arising as a side effect because of some inherent quality" and the latter being defined as "those sold other than as the manufacturer intended, and containing deleterious impurities." Rheingold at 970. According to this article, additional considerations flow from a finding that the drug is pure. Id. at 983. The problem with this definition is that in the instant case it is unclear whether a pure or impure drug is involved. It can be argued that Quadrigen was pure because its ingredients were as the manufacturer intended. On the other hand, it can be as persuasively contended that the drug was impure because the endotoxin that was released from the bacterial cell into the fluid was "a deleterious impurity" and thus the drug was defective.

Another commentator suggests a more reasonable test: "[T]he issue as to whether a substance not intended to be present is natural or foreign is completely immaterial on the ground that a product is to be regarded as defective *if a reasonable man would not have sold it had he known of the presence of the substance in the product.* Keeton, Products Liability—Liability Without ·Fault and the Requirement of a Defect, 41 Texas L.Rev. 855, 861–62 (1963). (Emphasis added.)

The commentary to the Torts Restatement provides perhaps the best working definition of a defect: "the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A, comment g at 351 (1965).

■ Whatever definition is used, in my opinion the proof amply sustained the fact that Quadrigen was defective and that the defect was the proximate cause of the injury sustained by Eric Tinnerholm. Compare Stromsodt v. Parke-Davis & Co., 257 F.Supp. 991 (D. N.D.1966). I need not discuss the evidence with respect to the biological and clinical testing of Quadrigen by Parke-Davis and the National Institutes of Health at this time although such matter has been fully considered by me in reaching conclusions on the warranty issues. The matter of testing will be amply discussed in the negligence portion of this opinion. However, certain of the articles that have been written in the field and received in evidence, the deposition of Dr. Margaret Pittman of the Division of Biologics Standards (hereinafter referred to as "DBS") of the National Institutes of Health .(hereinafter referred to as "NIH"), and testimony elicited at the trial are all important, have been considered by me in reaching this conclusion and will be discussed at some length herein.

■ The occurrence of encephalopathies following administration of vaccines containing a pertussis component has been long known but the specific element that causes this explosive assault to the brain has not been discovered. See Berg, Neurological Complications of Pertussis Immunization, British Medical Journal 24 (July 5, 1958); Byers & Moll, Encephalopathies Following Prophylactic Pertussis Vaccine, 1 Pediatrics 437 (1948). However, the fact that an encephalopathy can be caused by pertussis vaccine would not mean that liability would be incurred for breach of warranty in the instant case. Rather, the finding of an implied warranty breach is predicated on the fact that by manufacturing Quadrigen in the method chosen by defendant, the chances of contracting an encephalopathy were enhanced.

Aside from the clinical and laboratory studies of the benzethonium chloride preserved Quadrigen which, in my opinion, indicate a defect in defendant's product, the earliest literature which noted a problem with Quadrigen was published in 1960. Massachusetts Department of Public Health, Pertussis Immunization, 263 New England Journal of Medicine 410

(Aug. 25, 1960). The investigation indicated by this group "established that the potency of the pertussis-vaccine component in the quadruple antigen products * * * was relatively unstable." Pittman, Instability of Pertussis-Vaccine Component in Quadruple Antigen Vaccine, 181 Journal of the Am. Medical Ass'n 113 (1962). It is interesting to note this Pittman article points out that with the adoption of a unit of potency in 1953 with an upper limit placed on potency, no cases of fatal encephalopathy due to pertussis vaccine were reported to DBS although "occasional nonfatal neurological reactions" continued to occur. Id. at 114. Dr. Pittman hypothesized that "the preservative and the tissue-cell enzymes present" in the quadruple antigen vaccines "may be factors which contribute to instability." Id. at 118.

In 1964, a study was made with bordetella pertussis cells which showed that various substances influenced leakage from the bacterial cell. Niwa, Yamadeya & Kuwajima, Leakage of Cell Components of Bordetella Pertussis, 88 Journal of Bacteriology 809–10 (1964). Although benzethonium chloride was not used in that study, certain chemical substances similar thereto were employed (TR 1529–30).

Finally, in 1965, in an article co-authored by Dr. Pittman, it was stated:

"Recent work has shown that pertussis vaccine in DTP–P [diptheria-tetanus-pertussis-polio vaccine] preserved with benzethonium chloride is unstable in potency * * *. *This surface-acting preservative, no doubt, contributed to the greater toxicity of DTP–P * * * by favoring the leaching of the toxin from the bacterial cell.* It is well known that alkalinity favors lysis and thereby promotes toxicity." Pittman & Cox, Pertussis Vaccine Testing for Freedom-from-Toxicity, 13 Applied Microbiology 447, 453 (1965). (Emphasis added.)

When testifying at her deposition, Dr. Pittman attempted to water down her statement by contending that she considered this statement to be a mere hypothesis (Pittman deposition of Nov. 17, 1967, at 83 (hereinafter referred to as "Pittman I")), but that it was based on scientific experimental data (id. at 83–84). The statement in her article, written when she was not involved in the instant litigation, seems far more significant than her later attempt to diminish its importance. Dr. Pittman, throughout her testimony, appears to consider the instant litigation a personal attack and an indictment of DBS as well (Pittman deposition of Nov. 27, 1967, at 214–15 (hereinafter referred to as "Pittman II")).

Dr. Pittman also testified that leakage would be immediately ascertainable in the toxicity tests conducted by the defendant and DBS (Pittman I, at 79–80). However, she later stated she had absolutely no idea as to the extent of leakage or how long it would take (Pittman II, at 79–81), so it is most difficult to see how she could predict with any certainty that the toxicity tests would reveal the leakage phenomenon.

The foregoing documents lend significant credence to the testimony of one of plaintiffs' expert witnesses, Dr. Lapin, who stated that in his opinion Quadrigen was toxic and that the administration of the vaccine to the infant plaintiff caused the injury involved in this litigation. Coupled with this is the complete failure of defendant to offer any reasonable alternative cause of Eric Tinnerholm's injury.

The "defect" involved was, in my opinion and as already stated hereinbefore, the leakage of endotoxins from within the bacterial cell and it has been shown by a preponderance of the credible evidence that such defect was the proximate cause of the injury.

Nor can defendant argue that this was a marked improvement over Triogen so that it should be shielded from liability even if the above finding is correct. I will state now, and will have occasion to reiterate later that no need justified a risk of marketing Quadrigen at an early

date. Other products which performed the same function as the indicted vaccine without the danger involved were on the market and readily available to the medical profession. Although there is testimony that it is beneficial to the patient and the medical profession to reduce the number of injections, when balancing this with the tragic occurrence in the case at bar and perhaps several other cases, the reduction of injections argument pales into insignificance.

Accordingly, it is my opinion that the defendant has breached its warranty of merchantability to the plaintiff. In view of this discussion, the issues involving liability for breach of the warranty of fitness for a particular purpose need not be considered.

*Negligence.*

The finding of implied warranty liability does not preclude this Court from finding the defendant liable in negligence. Stromsodt v. Parke-Davis & Co., supra, 257 F.Supp. at 995. However, it is fundamental law that plaintiffs will be limited to one recovery.

Defendant herein is chargeable with negligence in failing to adequately test its product, for thereafter releasing the product for commercial distribution in the face of certain danger signs emanating from the test results, and in failing to adequately warn the medical profession of the risks inherent in its use.

It is established law that where a drug manufacturer develops a new drug subsequently found to produce harmful side effects which the manufacturer failed to discover in the course of testing the product, the manufacturer is liable in negligence where it appears that the drug in fact was inadequately tested or that the manufacturer failed to exercise due care in the development of the product prior to its release on the market

for commercial distribution. 3 Frumer & Friedman § 33.01[2]; Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2d Cir. 1967); Stromsodt v. Parke-Davis & Co., supra.

The tests which the various lots of vaccine had to undergo prior to their release on the market were generally biological and/or clinical in nature. Not only was it required that each lot fall within the acceptable standards of potency and toxicity established by DBS, but also the reports from the doctors in the field as well as those testing the vaccine under clinical conditions had to indicate that the drug was safe for use and that it produced no untoward adverse reactions in the recipients.

Both the potency and toxicity tests were first performed in the laboratories of the manufacturer. Once satisfactory results were achieved, the manufacturer would send the lot to DBS which, in turn, would conduct its own independent study. If the DBS test results confirmed the manufacturer's report or protocol, the lot would be approved for release on the market. If, on the other hand, the DBS results conflicted with the results set forth in the manufacturer's protocol, the lot would be returned to the manufacturer for re-testing.

As hereinbefore stated, the potency test was performed by injecting groups of mice with varying dilutions of vaccine, and, after a period of time, challenging the mice with virulent organisms. The protective activity of the vaccine was judged by the number of mice which survived the challenge at the various dilution levels. In addition, it was required that the pertussis vaccine component have no greater potency than 12 protective units per total human immunizing dose (THD).[11] Because a standard deviation is inherent in a test of this nature, a vaccine would be deemed satisfactory if the result of one test or

---

11. "THD" is the total dose of vaccine, administered in a series of three separate inoculations, that any one individual is required to be given in order to insure full immunizing protectivity. The "12 pro-

tective units" standard represents the number of bacteria within a total human dose which successfully immunizes the recipient from the disease without itself causing harmful side effects.

an average of the combined results of two or more tests indicated that the calculated protective activity of the vaccine fell within the allowable range of 8 to 36 protective units. Any result falling outside this range indicated that the particular lot was not fit for public use and consequently was unacceptable for distribution.

The standard toxicity test was performed by weighing a group of ten mice, injecting them with a test dose of vaccine and weighing them again at the end of periods of 72 hours and 7 days. A vaccine was accepted as being free from toxicity if at the end of 72 hours the group weight of the mice was no less that it had been at the initial weighing, and at the end of 7 days was greater than it had been initially. A lot automatically failed the test if it was determined that a mouse had died from the vaccine.

Although Parke-Davis found no problem in meeting the potency requirements in the testing of its triple antigen vaccine, Triogen, it is apparent from the correspondence between Parke-Davis and DBS during the year 1959 that beginning with the very first experimental lots of Quadrigen submitted to DBS for testing, i. e., Lots X–7513 and X–7514, Parke-Davis was having difficulty obtaining satisfactory potency values. On January 9, 1959, Dr. Workman of DBS wrote to Parke-Davis that:

"Our potency assays on the pertussis component of this lot (X–7514) showed values of only 7.9 and 3.8 units per total immunizing dose and thereby suggest the potency of the pertussis component is too low. In view of the extreme difference bewteen your and our results, however, we would be willing to give further consideration to this lot if you are willing to retest. * * *" Plaintiffs' Exh. 3.

Letters of a similar nature were written concerning Lots 049033, 059294, 049032, 049034, 054044, 055961, 051639, 058836 and others, which lots initially produced test results between 2.7 and 7.25 protective units per THD. Some of these lots were re-tested and eventually withdrawn from processing.

Evidencing Parke-Davis' dilemma, on March 5, 1959, only 4 months prior to the time Quadrigen was commercially marketed, George D. Brigham, Director of the Biological Division of Parke-Davis, wrote a letter to Dr. Workman regarding Lot X–7514:

"As you know from recent reports, we have been having difficulties in obtaining satisfactory potency values in our preliminary production lots of Quadrigen. In view of these results, we are planning to increase the H. pertussis content to 20 opacity units instead of 15 opacity units as was originally intended." Plaintiffs' Exh. 3.

In a follow-up letter dated March 13, 1959, from Dr. Brigham to Dr. Workman, it was further stated:

"You indicate in your letter that you are concerned with the low values we have been obtaining in the pertussis component of our multiple antigens. As far as we are aware, *our only problem seems to be with the quadruple antigens i. e. except for an occasional lower than usual result, our other pertussis-containing products are giving satisfactory potency tests.* Naturally, we have been concerned with the low pertussis test results in Quadrigen and as indicated in earlier correspondence, we plan to increase the concentration of organisms to a minimum of 20 opacity units per cc. as an immediate step to correct the situation." Plaintiffs' Exh. 3D. (Emphasis added.)

It seems significant to this Court that Parke-Davis, realizing the inherent potential of the pertussis component for causing fatal reactions, and faced with the unique problem of exceptional deficiencies in the potency values of its pre-market lots, simply sought to strengthen the pertussis component without considering the possible existence of a defect in the combination itself. This proposed solution, however, also presented problems. On June 4, 1959, Dr. Brigham

wrote Dr. Workman with reference to Lot 052230, the first commercial lot:

"We noted the *unusually high value obtained in the pertussis vaccine potency test.* In view of these high results we conducted a re-test on this lot. A supplemental protocol summarizing this test is attached indicating 21.5 units per total human dose. This confirms our thought that a re-test would probably show average results within an acceptable range." Plaintiffs' Exh. 3F. (Emphasis added.)

It appears clear to this Court that Parke-Davis in its rush to commercialization of its product either overlooked or neglected to consider the possibility that Quadrigen was too unstable a vaccine and therefore too unpredictable to be released on the market at that time.

■■■■■ Parke-Davis was equally negligent in failing to test its product under market conditions. Inasmuch as it was well known that variations in temperature could have marked effects on the safety and effectiveness of a vaccine, and it was also known, as testified to by Dr. McLean of Parke-Davis, that many of the lots could not be shipped under refrigerated or storage conditions, it was incumbent upon Parke-Davis to subject their pre-release lots to those foreseeable variations in temperature to which their product would be exposed prior to the point of inoculation so as to insure that this exposure would not produce deleterious effects. This was not done. As it developed, tests taken in 1960 by the Massachusetts Department of Health and subsequently by DBS, indicated that although samples of the quadruple antigen vaccine which were held in storage under refrigerated conditions showed no perceptible loss of potency, those purchased on the market revealed a loss of potency below the minimum requirements for a pertussis vaccine. Although events subsequent to the injury herein cannot be considered in determining the manufacturer's negligence, it could not have been clearer during 1959 that tests under market conditions were necessary and that the defects subsequently discovered in 1960 were foreseeable.[12]

Similarly, Parke-Davis was experiencing difficulty in its attempt to meet the minimum standards of toxicity. Even as late as August 1959, one month *after* Quadrigen had been released to the commercial market, certain lots which had been submitted by Parke-Davis to DBS for toxicity testing were being rejected. On August 25, 1959, a letter from Dr. Workman to Dr. Brigham, regarding Lot 054043, indicated:

"Our tests of the pertussis component for freedom-from-toxicity do not conform with the results reported in your protocol. Three tests were performed and 6 of 30 mice died by the end of 7 days." Plaintiffs' Exh. 3.

In a letter dated September 16, 1959, Dr. Brigham replied that Parke-Davis' own re-test of Lot 054043 resulted in the deaths of 4 of the 40 mice inoculated. Defendant admitted that although this lot passed a 10-mouse test given earlier, the lot "appears upon more extensive testing to have enough toxicity to fail to pass the Minimum Requirements test in a certain percentage of cases." Plaintiffs' Exh. 3.

Clinical trials of Quadrigen prior to marketing were conducted by Dr. Clarence D. Barrett, Director of the Division of Maternal and Child Health of the City of Detroit, beginning in 1956 and

12. It must be noted that in 1959 there were no regulations requiring a drug manufacturer to test its product under market conditions prior to releasing it for use to the general public. It is the opinion of this Court, however, that although it would be negligent for a manufacturer to disregard the regulations established by the National Institutes of Health in the manufacture of its drug products, a manufacturer cannot exempt itself from liability in negligence for failure to exercise due care in an area not covered by a specific regulation. See Stromsodt v. Parke-Davis & Co., supra at 997; Frumer & Friedman § 33.01[3].

terminating in 1959.[13] Although these trials were primarily designed to determine antibody response in children of various ages and to determine the earliest age in infancy at which immunization with Quadrigen could be started, Parke-Davis used these trials in its license application as a basis for the proposition that the clinical experience involving Quadrigen yielded no greater local or febrile reactions than was experienced with the triple antigen product.

■ Because of the nature of the vaccine used in the Barrett study and the lack of controls placed on the diagnostic and reporting procedures, it was negligent for Parke-Davis to have used this study as its basis for making the above representation. The pertussis component which Dr. Barrett used had been in cold storage for the two-year period immediately preceding the inoculations. It had been discovered that during this period of time the potency of the pertussis component had fallen below the NIH's minimum requirements for an acceptable vaccine. Nevertheless, it was used in the study. Although in the standard commercial production lots the benzethonium chloride is combined with the pertussis component at the point of manufacture and allowed to remain in combination throughout the entire storage period, such was not the case with the vaccine used in the Detroit study. There, the preservative was not combined with the pertussis component until the time that the children were to be inoculated. Consequently, the clinical trial could not validly test the extent to which the addition of the benzethonium chloride (one of the few important changes being made in the quadruple antigen product) increased the reactivity of the product. Although the vaccine

used may have been sufficient to determine the antibody response in the children tested, never having been subjected to market conditions and representing a quadruple antigen of lesser strength and of a different manufacturing process than the one eventually to be released on the market, it should not have been used as a barometer for judging local and febrile reactions.

Even had the vaccine used been an acceptable one for this purpose, the absence of controls over the diagnostic and reporting procedures made any conclusion with regard to the nature and extent of the reactions an invalid one. Mothers, most of whom came from the lowest socio-economic stratum of urban Detroit, had been asked to report, by telephone, all illnesses or reactions suffered by the children following their inoculations. No doctor or medical assistant at any time took the temperatures of the children either on the day that the vaccine was administered or subsequent thereto unless a mother, suspecting a reaction, brought her child back to the clinic. Needless to say, it was somewhat presumptuous to assume the mothers' ability to recognize a "reaction", to assume their possession of thermometers with which to determine whether their children were experiencing febrile reactions, to assume the availability of telephones with which to communicate the fact that a reaction had been suffered, and hypothesizing the fact that telephones were available, to assume the dependability of the mothers to make the requested reports. To allow any implication to be derived from this study with regard to the incidence of reactions following the inoculation of the children was negligence on the part of the defendant herein.[14]

13. Barrett, Timm, Molner, Wilner, Fahey & McLean, Multiple Antigen for Immunization Against Poliomyelitis, Diphtheria, Pertussis and Tetanus, 49 American Journal of Public Health 644 (1959); Barrett, Timm, Molner, Wilner, Anderson, Carnes & McLean, Multiple Antigen for Immunization Against Poliomyelitis,

Diphtheria, Pertussis and Tetanus, 167 Journal of the American Medical Association 1103 (1958).

14. Although a separate study had been conducted by Dr. Barrett in 1958, using fresh experimental vaccine and employing stricter controls over the diagnostic and reporting procedures, this study

██ Quadrigen was then made available to selected members of the medical profession who were requested to comment on their experience with the product. Enough of the "field trials" indicated a marked increase in reactions among the patients given Quadrigen over those being given the triple antigen product with a separate inoculation of the poliomyelitis vaccine to have required Parke-Davis to experiment further with their newly-developed quadruple antigen. There were some reports indicating up to 75 per cent reactions in the children tested whereas other reports indicated that no reactions whatsoever had been suffered. Some of these contrasting reports involved experiences with the same lot of vaccine. In other reports which indicated reaction rates as low as 2 per cent, the "Remarks" sections indicated that "slight fever" was not reported, "high temperature" was designated "no reaction", and "103-degree temperature" designated as a "slight reaction". In one report, only temperature of 105 degrees qualified as a "reaction". Many of the reports which indicated unrealistically low reaction rates were from doctors who, by the nature of their covering letters, seemed primarily interested in obtaining more of the free vaccine. In addition, it is most significant that the deposition testimony of Dr. John E. Gajewski, employed during 1959 in Parke-Davis' Department of Clinical Investigation and thereafter as Assistant Director of Medical Correspondence, indicated that during the period between July 1959 and September 1961 the reported incidents of febrile reactions with Quadrigen showed more frequent and higher temperature elevations. Similarly, and in the face of the testimony of Dr. Feinberg and Dr. Lapin that it was a rare instance when the triple antigen vaccine produced a fever of 104 degrees, the results of a study conducted by Dr. Sauer, the inventor of the original pertussis vaccine, submitted for publication on June 10, 1959, and published in the fall of that year, evidenced that of the large groups of infants inoculated with Quadrigen, 5 per cent reacted with temperatures of 104 degrees and as much as 2 per cent reacted with temperatures of 105 degrees. All in all, it appears to this Court that there existed a sufficient number of both unrealistic and conflicting reports from the field to have required Parke-Davis to take a serious second look at its product before placing it on the market.

Of particular note was Parke-Davis' cursory attempt to investigate the cause of a reported death attributed by the treating physician to his use of Quadrigen. Although the autopsy report, received subsequently by Parke-Davis, stated that the immediate cause of death was bronchial pneumonia, the hospital record revealed that the patient had exhibited high fever, convulsions, opisthotonus, vomiting and lethargy several hours after a Quadrigen inoculation. The conclusion of the autopsy report is not necessarily inconsistent with a finding that the child experienced a pertussis encephalopathy prior to his death in that although bronchial pneumonia may have been the immediate cause of the infant's expiration, such condition can frequently be brought about by some other condition, which, in this case, in light of the small hemorrhages found in the subarachnoid portion of the brain, could well have been the vaccinal encephalopathy as was originally diagnosed. Nevertheless, there should have been an immediate and thorough investigation conducted by Parke-Davis into the possible connection between the Quadrigen inoculation and the infant's death two days subsequent thereto, especially in view of the fact that the quadruple antigen was soon to be released on the commercial market. This was not done nor did Parke-Davis attempt to notify the NIH of the possi-

showed increased febrile reactions with the use of Quadrigen, and was not the principal study relied upon in support of the license application. To the contrary, it was the Detroit study discussed in the accompanying text which Parke-Davis attached to its application and upon which it relied most heavily.

ble existence of a Quadrigen-related death.[15]

■ In considering the above discussion, it should be understood that the entry of Quadrigen on the market in July 1959 was not a response to a situation in which an epidemic or need existed justifying the risk of premature marketing since products were already available to the medical profession which satisfactorily accomplished that which Quadrigen was designed to do. Stromsodt v. Parke-Davis & Co., supra 257 F.Supp. at 996–997.

■ In addition to defendant's negligence in failing to further test its product in the face of evidence that the quadruple antigen was unstable, and in the absence of a public need justifying its premature release on the market, defendant was similarly negligent in not adequately warning the medical profession of the dangers inherent in its use.

■ It is the opinion of this Court that a drug manufacturer is under a duty to warn the medical profession of dangers inherent in its biological drugs which, in the exercise of reasonable care, it knew or should have known to exist. Sterling Drug, Inc. v. Cornish, 370 F.2d 82, 84–85 (8th Cir. 1966); Stromsodt v. Parke-Davis & Co., supra, 257 F.Supp. at 997; Love v. Wolf, 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (1964); Alfieri v. Cabot Corp., 17 A.D.2d 455, 235 N.Y.S.2d 753 (1st Dep't 1962), aff'd, 12 N.Y.2d 1098, 240 N.Y.S.2d 163, 190 N.E.2d 535 (1963); Marcus v. Specific Pharmaceuticals, Inc., 82 N.Y.S.2d 194 (Sup.Ct.1948); Frumer & Friedman, supra § 33.01[3]; Restatement (Second) of Torts § 388 (1965); Rheingold at 993, 994. "Watering down" the substance of a warning so as to give false assurance to the medical profession that a drug or biological can be safely administered, thereby minimizing the danger which exists in the use of a product, amounts to an inadequate warning. Love v. Wolf, supra, 38 Cal.Rptr. at 193,

197; Alfieri v. Cabot Corp., supra; Rheingold at 993, 994. Inasmuch as doctors have the right to and in fact do rely on the brochures sent to them by the manufacturers regarding safety in the use of their products, Gielskie v. State, 18 Misc.2d 508, 191 N.Y.S.2d 436, 439 (Ct.Cl.1959), rev'd on other grounds, 10 A.D.2d 471, 200 N.Y.S.2d 691 (3rd Dep't 1960), aff'd, 9 N.Y.2d 834, 216 N.Y.S.2d 85, 175 N.E.2d 455 (1961), a manufacturer is negligent who, after reporting the results of its tests to the FDA, and on the strength of those reports markets its products, discovers new harmful side effects produced by the drug, yet fails to send out warnings of this new development to the foreseeable users, i. e., doctors and dispensaries. Sterling Drug, Inc. v. Cornish, supra, 370 F.2d at 85; De Vito v. United Airlines, Inc., 98 F.Supp. 88, 96 (E.D.N.Y. 1951); Gielskie v. State, supra; Rheingold at 995.

Since the relevant portions of the warning which Parke-Davis issued in the form of a package insert are specifically set forth in the express warranty portion of this opinion, there is no need to recite them at this time.

Knowing that the only advantage in administering Quadrigen rather than the trivalent vaccine was the reduction from two to one of the number of inoculations required for each immunization, it is reasonable to assume that had the doctors been informed that greater reactivity could be expected from the quadruple antigen, they would not have subjected their patients to needless risk by using this product. Fully realizing this, Parke-Davis, employing the technique of ambiguity and a shrewd use of descriptive adjectives, was able to gloss over those facts which would have dissuaded the doctors and dispensaries from using their product, thereby lulling the medical profession into a false sense of security.

■ The brochure states that "[t]he incidence [of reactions with Quadrigen] is *usually* no greater than is normally

15. See note 12, supra.

expected with trivalent vaccine." (Emphasis added.) This statement is misleading in that it reasonably permits one to conclude that the results from the studies conducted by the manufacturer have shown that Quadrigen has produced no greater reactions in the recipients thereof than did Triogen, with the exception of an insignificant number of isolated instances. Of course, this was not true. If Parke-Davis thought that in this instance it could legitimately use the word "usually" to mean "in a majority of the lots tested", it was clearly in error, for under that interpretation the manufacturer could conceal from the medical profession a 49 per cent increase in the reaction rate of its products. For example, if Product A and Product B produce reaction rates of 50 per cent and 60 per cent, respectively, in all the lots tested, it is conceivable that a manufacturer could represent that there is "usually" no greater reaction found to exist in Product B than in Product A, relying on the fact that only 1 additional person out of every 10 tested reacted to Product B. This method of linguistic distortion is grossly misleading. Clearly, any significant increase found to exist in the reaction rate of a particular drug must be disclosed.

As hereinbefore stated, a study conducted by Dr. Sauer, submitted for publication in June 1959, revealed that 7 per cent of the children inoculated with Quadrigen suffered fevers of 104 degrees and above. Parke-Davis alleges that the reason such study was not mentioned in its brochure was that the Sauer report had not been published until after Parke-Davis had written its package insert. However, it would appear from the evidence that Parke-Davis was fully familiar with the contents of this report in light of Dr. Sauer's continuing association with defendant since the early days in the development of the pertussis vaccines. As the cases cited above hold, it was Parke-Davis' duty timely to amend its brochure to inform the medical profession of any significant new developments or information which could rea-

sonably be expected to affect a doctor's decision to use the product. Had Parke-Davis promptly amended its literature to include the results of the study conducted by Dr. Sauer, the medical profession would have been apprised prior to the day that the infant plaintiff was inoculated of the unusual reactivity produced by Quadrigen.

Having raised the possibility at trial that plaintiff's injury could have been caused by an allergic reaction and therefore due to plaintiff's own particular hyper-sensitivity (a possibility rejected by me herein), it would appear sufficient to note in passing that defendant was under a duty in 1959 to warn the medical profession of this possibility, especially in view of the fact that such an etiological theory had been recognized since 1947. Berg, Neurological Complications of Pertussis Immunization, British Medical Journal 26 (July 5, 1958). Inasmuch as Parke-Davis did see fit to warn of a possible allergic reaction to penicillin and streptomycin, the two antibiotic residuals from the poliomyelitis vaccine, it similarly should have warned of that possibility with regard to the pertussis component.

Finally, the warning that "[l]ocal reactions have been known to be more severe when the child is in the incubative stage of pertussis" was ambiguous in that it reasonably could have misled the members of the medical profession to believe that only in cases where the child was in the incubative stage of pertussis would encephalitic symptoms occasionally occur. Stromsodt v. Parke-Davis & Co., supra, 257 F.Supp. at 997. This was Dr. Feinberg's interpretation and, in the opinion of this Court, could reasonably have been followed by others.

After due consideration and for the reasons set forth herein, it is the opinion of this Court that the defendant was negligent both in its failure to adequately test its product prior to releasing it on the commercial market and for its failure to adequately warn the medical profession of the dangers inherent in its use.

As stated by the late Justice Jackson, dissenting in Dalehite v. United States: [16]

> "This is a day of synthetic living, when to an ever-increasing extent our population is dependent upon mass producers for its food and drink, its cures and complexions, its apparel and gadgets. These no longer are natural or simple products but complex ones whose composition and qualities are often secret. Such a dependent society must exact greater care than in more simple days and must require from manufacturers or producers increased integrity and caution as the only protection of its safety and well-being. Purchasers cannot try out drugs to determine whether they kill or cure. * * * Where experiment or research is necessary to determine the presence or the degree of danger, the product must not be tried out on the public, nor must the public be expected to possess the facilities or the technical knowledge to learn for itself of inherent but latent dangers. The claim that a hazard was not foreseen is not available to one who did not use foresight appropriate to his enterprise."

Finally, as to the damages claimed, I have been guided by the principle enunciated by the New York courts that damages are compensatory, not punitive. Little purpose would be served by further detailing the catastrophe irrevocably visited on this infant child.

The plaintiff father is, of course, entitled to recover for the loss of the child's services and for medical attendance and expenses. Kalina v. General Hospital, 31 Misc.2d 18, 20, 220 N.Y.S.2d 733, 735 (Sup.Ct.1961), aff'd, 18 A.D.2d 757, 235 N.Y.S.2d 808 (4th Dep't 1962), aff'd mem., 13 N.Y.2d 1023, 245 N.Y.S.2d 599, 195 N.E.2d 309 (1963). The parties have stipulated that his out-of-pocket payment for hospital and medical expenses for the infant total $3,470.55 and payments made by him to the State hospitals total $2,812.97, for which he is entitled to recover herein. Eric has been confined to State institutions since January 30, 1962 and will require institutional care, either of a public or private nature, for the rest of his life.

Defendant suggests that since the infant plaintiff might be cared for at State expense, the doctrine of Drinkwater v. Dinsmore, 80 N.Y. 390 (1880) should be applied. Such "collateral source" doctrine, however, has been severely limited in recent years in its application. Klein v. United States, 339 F.2d 512 (2d Cir. 1964); Feeley v. United States, 337 F.2d 924 (3rd Cir. 1964); Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308 (2d Cir. 1964). Moreover, it is inapplicable in the present case since liability for such expenses may be asserted herein against plaintiff father and plaintiff infant. The present cost of maintaining the infant at Suffolk State School is $6,000, which the State may recover from the father. New York Mental Hygiene Law, McKinney's Consol.Laws, c. 27, § 24. Even though it has accepted lesser payments in past years, it may recover the full reimbursement rates less the payments already made, § 24(9) (b), which potential recovery for the past period of institutionalization is fixed at $33,000. Such sum is subject to the lien of the State under § 24(5) (b). Defendant may, for its own protection and if so advised, move to have such lien determined.

I have not included any amount to cover the nursing services rendered by the infant's mother during the period from December 1, 1959 to January 30, 1962, for lack of proof that such services were other than would normally have been rendered by a mother to her child. I do award the plaintiff father $2,500 for the loss of the child's services during minority.

The damages properly awarded to the infant are to cover future

16. 346 U.S. 15, 51, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

medical expenses, to reimburse him for future loss of wages, and to cover past, present and future pain and suffering. With respect to future medical expenses, it seems clear that Eric will require institutionalization for the rest of his life. However, in view of the injury, I believe from the evidence that a present life expectancy of 50 years is a reasonable approximation. Also, recognizing the continuing rise in medical costs and the fact that Eric may well be entitled to private nursing and therapy additional to what may be received under State care, I believe that $160,000 would be a fair amount to ensure him adequate future medical care. Loss of wages may also properly be awarded. Grayson v. Irvmar Realty Corp., 7 A.D.2d 436, 184 N.Y.S.2d 33 (1st Dep't 1959).

■ The defendant contends that since the infant will be permanently confined to an institution he will have little need for damages attributed to loss of earnings. The only authority cited for this proposition is Scolavino v. State, 187 Misc. 253, 263, 62 N.Y.S.2d 17 (Ct.Cl.), modified, 271 App.Div. 618, 67 N.Y.S.2d 202 (3rd Dep't 1946), aff'd, 297 N.Y. 460, 74 N.E.2d 174 (1947), and is clearly inapposite since the condition of the infant in that case prior to the accident made his future employment impossible, i. e., loss of future earnings was not attributable to the accident. Accordingly, taking into account a 5 per cent discount factor and making the valid assumption that Eric would not have commenced to work until age 21, I award him $50,000 for loss of future earnings.

■ To the out-of-pocket losses suffered by this infant must be added the general damages for pain and suffering. Little purpose would be served in further dwelling on the various aspects of his past, present and permanent condition. He has undergone two spinal taps and a craniotomy, is partially paralyzed and subject to seizures. He is not comatose, however; he is not a vegetable. Accordingly, after careful consideration of this case and of others in which somewhat similar injuries were involved,[17] I consider an award of $400,000 for pain and suffering reasonable and just.

In summary, I find as follows:

I. For plaintiff Carl F. Tinnerholm—
 (a) Reimbursement for medical expenses paid ..... $ 6,283.52
 (b) For Past medical expenses for which liable .... 33,000.00
 (c) Loss of Services ........................... 2,500.00

II. For the infant plaintiff Eric Tinnerholm—
 (a) Future medical expenses ................... $160,000.00
 (b) Loss of future earnings ................... 50,000.00
 (c) Pain and suffering ....................... 400,000.00

The foregoing represents the Court's findings of fact and conclusions of law.

A judgment shall be entered for plaintiffs in conformity herewith.

---

17. See, e. g., Christopher v. United States, 237 F.Supp. 787 (E.D.Pa.1965) (29-year old man — paraplegic — $350,000); Schwartz v. United States, 230 F.Supp. 536 (E.D.Pa.1964) (43-year old man— facial cancer—over $600,000); Wolfe v. General Mills Inc., 35 Misc.2d 996, 231 N.Y.S.2d 918 (Sup.Ct.1962) (30-year old man—brain injury—$240,000).