Shane STROMSODT, a minor, by Robert M. Stromsodt, his guardian ad litem, Plaintiff,

v.

PARKE–DAVIS AND COMPANY, a corporation, Defendant.

Civ. No. 3992.

United States District Court
D. North Dakota,
Northeastern Division.

Sept. 28, 1966.

Melvin M. Belli, of Belli, Ashe, Gerry & Ellison, San Francisco, Cal., Mart R. Vogel, of Wattam, Vogel, Vogel, Bright & Peterson, Fargo, N. D., Carlton G. Nelson, and Jerome J. Mack, of Nelson & Mack, Grand Forks, N. D., for plaintiff.

Harold D. Shaft, of Shaft, Benson, Shaft & McConn, Grand Forks, N. D., for defendant.

## MEMORANDUM AND ORDER

RONALD N. DAVIES, District Judge.

This is a product liability case tried to the Court without jury, involving the ethical drug Quadrigen made by the Defendant, Parke-Davis and Company, containing four antigens: diphtheria toxoid, tetanus toxoid, pertussis (whooping cough) vaccine and poliomyelitis vaccine. It was also described as a quadruple antigen with a prophylaxis against diphtheria, pertussis, tetanus and poliomyelitis. Jurisdictional requirements of 28 U.S.C.A. § 1332, have been met.

The Plaintiff was originally shown as "Robert M. Stromsodt, guardian ad litem of Shane Stromsodt, a minor." By ex parte order entered by this Court April 1, 1966, leave was granted Plaintiff to amend the caption of the amended complaint to include "and Robert M. Stromsodt, individually." The Defendant moved the Court to set aside this order, urging that it was given no opportunity to object to it and contending that the North Dakota Statute of Limitations had run as against any claim of Robert M. Stromsodt, individually. A ruling was reserved on this motion.

To make certain that the issues are solidly joined in this cause, and that its ultimate resolution may not be attacked by reason of any real or fancied future claim to which the Defendant may think itself exposed, the Defendant's motion, upon which ruling was reserved, must be and it is hereby granted. The Defendant's motion to dismiss the cause of action as to Robert M. Stromsodt, individually, must be and it is hereby granted, for the reason that the complaint fails to state a cause of action as to Robert M. Stromsodt, individually. This case is ordered captioned as it appears herein, that is, "Shane Stromsodt, a minor, by Robert M. Stromsodt, his guardian ad litem, Plaintiff, versus Parke-Davis and Company, a corporation, Defendant," and as so styled it will be adjudicated.

In 1953 Parke-Davis commenced studies for the purpose of determining the feasibility of combining poliomyelitis vaccine with the company's trivalent antigen sold under the trade name "Triogen," containing diphtheria toxoid, tetanus toxoid and pertussis vaccine. Parke-Davis' product, Quadrigen, which has heretofore been described, was finally developed and licensed March 25, 1959, and its manufacture authorized by the Department of Health, Education and

Welfare (HEW). Commercial marketing of the drug under the trade name "Quadrigen" commenced in July of 1959 with Quadrigen having an expiration dating period of twelve months after manufacture, and six months after issue.

On April 13, 1961, the Division of Biologics Standards (DBS) of the National Institutes of Health (NIH) issued a memorandum to manufacturers of multiple antigen products containing pertussis and poliomyelitis vaccines that the products could contain no less than 14 units of pertussis potency (previously 12) and be labeled with an expiration date of six months after manufacture, and four months after issue. This change was necessitated when studies indicated a significant loss of pertussis potency in quadruple antigen vaccines after marketing. No comparable loss of pertussis potency had been found in triple antigen products not containing poliomyelitis vaccine.

DBS then determined that some lots of inactivated poliomyelitis vaccine contained a live vacuolating agent, (SV 40), from the monkey kidney cells on which poliomyelitis virus was grown. Resultantly, a memorandum was issued May 20th, 1961, requiring the subsequent lots of vaccines containing components grown on monkey kidney cells be free of live SV 40.

On August 23, 1961, DBS issued a regulation or letter placing a new toxicity test requirement on all products containing pertussis vaccines; and on September 21, 1961, provided a new reference vaccine for the pertussis potency test which effected an additional increase in the potency requirement. The new toxicity test required additional treatment of the pertussis component. This treatment adversely affected the pertussis potency to the extent that the potency requirement could not consistently be met. Various articles appearing in medical literature indicated that the poliomyelitis component and the preservative being used might be the cause of the instability in multiple vaccines. Produc-

tion and marketing of "Quadrigen" was finally halted in November, 1962.

Shane Stromsodt was born in Grand Forks, North Dakota, May 24th, 1959. His mother's pregnancy and his birth were entirely normal and uneventful, according to her physician, Dr. John H. Graham. On August 26th, 1959, Shane was taken for examination to Dr. Graham's office; and on that date Quadrigen was administered to him intermuscularly. The infant seemed to suffer no ill effects, and his mother recalled no reaction which caused her any alarm. On October 1, 1959, some five weeks later, Shane was again taken to Dr. Graham's office, examined and once more Quadrigen was injected into the child's body, between four and five o'clock that afternoon. Mrs. Stromsodt bundled up the child and took him to the family car in which her husband, Robert, was waiting. She reached the car some five or ten minutes after Shane had received the Quadrigen, removed the blankets from about the child, and noticed a fine red rash on his face.

The Stromsodts drove to their home where Shane was undressed, and the rash noticed on his face and the upper part of his body. Mrs. Stromsodt gave Shane his bottle immediately after the family had their meal. Shane promptly vomited the bottle's contents, something he had never done before. Mrs. Stromsodt laid the child on the bed and testified the baby had a "seizure." She described his eyes as rolling back in his head, his heels and head dug into the bed, his back arched and his fingers grasping. Mrs. Stromsodt believes the convulsion may have lasted five minutes. Having no idea of what was happening, she watched Shane and when the seizure was over, telephoned Dr. Graham. She described to the Doctor what had happened to Shane and added that she thought the baby had the measles. The Doctor, however, thought it was a reaction from the shot given Shane and instructed Mrs. Stromsodt to watch him and to telephone next morning if the child was no better. Shane seemed normal the next morning, and Mrs. Stromsodt did not call the Doc-

tor nor see him again until November 4, 1959, when the baby was taken to Dr. Graham's office for a third shot. Shane slept most of the next two days following the initial seizure, but he had two more convulsive attacks after the first one, both of which were prior to November 4, 1959.

When Shane was taken to Dr. Graham's office November 4, 1959, Mrs. Stromsodt recited his condition to the Doctor. She told him the baby had suffered from two "spells" since the last Quadrigen shot, that he had been sleeping more and "it seemed like he wasn't doing anything any more." In short, the child was not progressing normally. The Doctor concluded that Shane should not be given Quadrigen because of the severe reaction suffered by the infant following the October 1 injection of that drug, and thus, on his third trip Shane was given Triogen which contained diphtheria toxoid, pertussis vaccine and tetanus toxoid (DPT). Poliomyelitis vaccine was not given on this date.

Shane continued to have difficulties which stemmed from the October 1st introduction of Quadrigen into his body and repeatedly had seizures until January, 1960. Mrs. Stromsodt testified the baby was making no progress. On January 13, 1960, the Stromsodts sought the advice of a specialist in pediatrics and took Shane to Dr. Samuel L. Pettit in Grand Forks. The Doctor prescribed phenobarbital for the child and testified that he finally prescribed a conventional dosage of one-quarter grain phenobarbital three times a day for Shane, which amounts he continues to receive.

When trial of this case began Shane was nearly seven years old. The record shows he walks unsteadily, lacks coordination, speaks but a few words, has none of the basic childhood skills normally possessed by children of his age and can neither read nor write. Uncontraverted medical testimony disclosed that he has damage to the brain and central nervous system. Shane is definitely, permanently and irreversibly injured, and in all probability his parents shortly will be unable to give him the necessary care and the boy will have to be institutionalized.

■ A careful weighing of all the credible medical testimony in this case leads this Court to the inescapable conclusion that the competent producing cause of Shane Stromsodt's condition was Quadrigen, and that chronologically and etiologically Shane's condition is traced directly to the Quadrigen administered to him October 1st, 1959.

Of the several theories under which the Plaintiff seeks to recover in this action, only two are sustainable and require discussion here. They are breach of an implied warranty and negligence.

### Breach of Implied Warranty

"The liability in negligence of a manufacturer or other supplier for damage caused by his product is based on the supplier's failure to exercise reasonable care. Hence, negligence is a tort concept based on fault.

"Although the courts are occasionally confused about the matter, warranty, on the other hand, is not a concept based on fault or on the failure to exercise reasonable care. But this does *not* mean that warranty is necessarily contractual or nontortious in nature. Liability in warranty arises where damage is caused by the failure of a product to measure up to express or implied representations on the part of the manufacturer or other supplier. Accordingly, an injured person is not required to prove negligence in a warranty-products liability case.

"This has been concisely summarized as follows:

" 'There seems to be some confusion in understanding the nature of implied warranty liability. In the first place, concepts of negligence and fault, as defined by negligence standards, have no place in warranty recovery cases. Proof of negligence is unnecessary to liability for breach of implied warranty and lack of it is immaterial to defense thereof. Since the warranty

is *implied* [emphasis by court], either in fact or in law, no express representations or agreements by the manufacturer are needed. Implied warranty recovery is based upon two factors: (a) The product or article in question has been transferred from the manufacturer's possession while in a "defective" state, more specifically, the product fails either to be "reasonably fit for the particular purpose intended" or of "merchantable quality," as these two terms, separate but often overlapping, are defined by the law; and (b) as a result of being "defective," the product causes personal injury or property damage.' " 2 Frumer & Friedman, Products Liability, Chapter 3, Sec. 16.01[1].

■ None of the experts called by either party could or would state which particular ingredient in Quadrigen caused the damage to Shane Stromsodt. Plaintiff's witness, Dr. Ronald Okun, testified that there was evidence to show that pertussis endotoxin made the other components of Quadrigen more liable to cause an anaphylactic sort of reaction in a patient. Other evidence indicated that the product was rendered defective by the instability of potency in the pertussis vaccine. The evidence justifies the conclusion that the Plaintiff's injuries and damages were caused by a defect in the Quadrigen, and that such defect constitutes a breach of the implied warranty of merchantability.

■ The asserted lack of privity is not a defense in North Dakota to a claim based upon breach of an implied warranty. See Lang v. General Motors Corporation, 136 N.W.2d 805 (N.D.1965). This apparently would be particularly

true in actions by the ultimate consumer against a manufacturer for breach of implied warranties where "through advertising or other media of education and information defendant has convinced and persuaded the medical profession to prescribe its drug, since it is in the very competitive field of supplying drugs and medicines for the alleviation of human suffering as well as for its own pecuniary advantages." Bennett v. Richardson-Merrell, Inc., D.C., 231 F.Supp. 150.

### Negligence

■ The finding that Parke-Davis breached the implied warranty of merchantability and that Plaintiff's injuries were caused thereby does not preclude a finding that the Defendant is also chargeable with negligence in failing adequately to test the product and adequately to warn of the dangers inherent in its use.

The insert,[1] under "Reactions", reads:

"When given in accordance with suggested methods, local and systemic reactions following the administration of Quadrigen are usually mild. The incidence is usually no greater than is normally experienced with trivalent vaccine. Local reactions and fever of short duration may occur, however, and parents should be cautioned not to apply local treatment, such as wet dressings or heat. Any child who shows a febrile reaction should be kept quiet, should be offered water repeatedly and may be given one or more doses of aspirin as indicated. Occasionally, a residual induration or circumscribed nodule may persist for a week or more.

"In instances of more marked reaction, the immunization may be com-

---

1. Exhibit 46 is a tiny bottle of Quadrigen contained in a small cardboard box which included also Parke-Davis' insert showing what the product was designed to do. It is observed that the bottle itself contained no warning whatever, the cardboard box in which it was enclosed contained no warning whatever. The insert itself, a single sheet of paper containing in the main very small print, showed the nature of the product, when to immunize, dosage and administration, recall or booster doses, reactions and storage instructions, and was printed on a sheet measuring approximately four by seven inches, in which were compressed approximately 1,444 words, excluding the reference list on the bottom of the reverse side.

pleted with monovalent antigens or other combinations of antigens.

"Local reactions have been known to be more severe when the child is in the incubative stage of pertussis. Encephalitic symptoms occasionally occur with acute pertussis though rarely with the use of the prophylactic vaccine. Such severe symptoms of the central nervous system include convulsions and lethargy. They may be followed by mental or physical manifestations, sometimes permanent, or even by death; but fortunately such reactions are extremely rare.

"The poliomyelitis vaccine components of Quadrigen contains small amounts of penicillin and streptomycin used in culturing the virus. During the adsorption process most of the antibiotic content is removed. In fact, residual antibiotics in the adsorbed product are usually not demonstrable by ordinary laboratory technics. However, consideration should be given to the possibility of allergic reactions in individuals sensitive to these antibiotics and they should be tested for sensitivity where this possibility exists.

"The value and importance of maintaining continuing antibody levels in the infant in relation to the possibility of provocation of paralytic poliomyelitis by injection are self-evident. In modern clinical practice the administration of medication by hypodermic injection is generally accepted, and the hazard of thereby provoking poliomyelitis is increasing. If, however, basic immunity against poliomyelitis as evidenced by circulating antibody has been achieved, provocation is quite unlikely. Also, it should be noted that Quadrigen is considered *less* likely to provoke paralysis than is the trivalent product not containing poliomyelitis vaccine. With products not containing poliomyelitis antigen the patient is at some risk following each injection. With Quadrigen, on the other hand, after the first injection, basic immunity is developing and risk

is greatly decreased for subsequent inoculations. Furthermore, if current recommendations are followed, the course of immunization will be started during the first 6 months of life under the protection of passive maternal antibody. However, the hazard of provocation in the face of an epidemic, particularly with the first dose of Quadrigen, cannot be ignored and the physician should exercise discretion, as with any injectable."

Clinical trials of Quadrigen prior to marketing were conducted by Dr. Clarence D. Barrett of Detriot beginning in 1956 and terminating in 1959. These tests used Quadrigen considered "fresh" in that the product was less than six months of age from the date of "pooling" of the poliomyelitis component with the DPT fraction. The trials were designed to determine antibody response and the earliest age in infancy at which *immunization against poliomyelitis,* diphtheria, tetanus and pertussis would be started, using a multiple antigen against all four diseases. No clinical reactions of any serious consequence were reported or observed.

Quadrigen was then made available to selected members of the medical profession who were requested to comment on their use of the product. These "field trials" indicated a marked increase in reactions among patients given Quadrigen over those being given DPT and poliomyelitis vaccine. Of the severe reactions reported the first apparent instance in which death resulted was in March of 1959. It does not appear that Parke-Davis made any effort to determine the cause of the high incidence of reactions, and only a cursory attempt was made to investigate the cause of a death attributed to the use of Quadrigen.

■ It appears to this Court that adequate tests performed prior to marketing would have disclosed the product's potency instability as well as the cause of greater incidence of reaction, especially in view of the number and seriousness of the reactions being reported. This was not a situation where an epi-

demic existed or where need justified the risk of premature marketing since products were already available to the medical profession that satisfactorily accomplished that Quadrigen was designed to do.

■ Although all of the Government regulations and requirements had been satisfactorily met in the production and marketing of Quadrigen, the standards promulgated were minimal. The Defendant still owes a duty to warn of dangers of which it knew or should have known in the exercise of reasonable care. Love v. Wolf, 226 Cal.App.2d 378, 38 Cal.Rptr. 183. See also Ebers v. General Chemical Co., 310 Mich. 261, 17 N.W. 2d 176; Brown v. Globe Laboratories, 165 Neb. 138, 84 N.W.2d 151; Gonzalez v. Virginia-Carolina Chemical Company, 239 F.Supp. 567 (DC, SC, 1965).

■ The danger must be reasonably foreseeable and the injury must be proximately caused by the failure to warn. The Defendant knew or should have known that Quadrigen might cause encephalopathies in some users and to warn of the danger.

■ Though this may have been the first case in which encephalopathy[2] occurred after the administration of Quadrigen, it does not preclude the finding of foreseeability and negligence. See Roberts v. United States, 316 F.2d 489 (3 Cir., 1963).

The warning "Local reactions have been known to be more severe when the child is in the incubative stage of pertussis" on the insert accompanying the product, not only would not have warned members of the medical profession, but might have misled them to believe that only in cases where the child was in the incubative stage of pertussis would encephalitic symptoms occasionally occur.

There is no competent evidence in the entire record, medical or otherwise, to show that Shane's condition arose out of or from any susceptibilty or predisposition, nor that the child had any congenital disease or disorder or defect of any kind, nor that he had any allergy or idiosyncrasy, nor that heredity was a factor that might account for his present condition.

This Court being of the opinion that the Defendant is liable both for breach of an implied warranty and for negligence, it becomes unnecessary to forecast whether the Supreme Court of North Dakota would apply Sec. 402 A of the Restatement of Torts in a situation such as is here presented.

As pointed out in 2 Frumer-Freidman, Chapter 3, Sec. 16A [4]:

"Strict liability in tort in the products liability area is in its infancy. Therefore, the precise scope of the rule and the defenses thereto have not as yet been clearly defined. It is believed, however, that strict liability in tort is for the most part no different than strict liability in warranty, that similar results can be achieved under either theory. Comment *m* to § 402A of the Restatement of Torts seems to agree. It states:

"'There is nothing in this section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer.'

"But in the next sentence it is pointed out that,

"'if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.'

"If a court does not require, *inter alia*, privity of contract, a sale, or notice of a breach of warranty, does it matter that the defendant is being held strictly liable in warranty rather than in tort? The answer seems obvious. If a court imposes strict warranty liability irrespective of contract and sales rules, then strict liability

---

2. Any degenerative disease of the brain.

in warranty and tort are synonymous."

The Plaintiff has sustained the burden of proving, by a fair preponderance of the credible evidence adduced upon trial, that Parke-Davis has breached an implied warranty, and in addition, has been guilty of tortious negligence. The verdict which this Court reaches, and the damages awarded, are supported by either one or both of these theories.

It is my conclusion that the sum of $500,000.00 constitutes a fair, just and adequate award to Shane Stromsodt, considering the totality of circumstances in this lawsuit.

Counsel for the Plaintiff are directed to prepare and submit through the Clerk of this Court findings of fact, conclusions of law, order for judgment and judgment with the least practicable delay.