Bertram Harnett, J.
In Tinnerholm v. Parke Davis & Co. (285 F. Supp. 432, affd. 411 F. 2d 48), the Federal courts found that Parke Davis manufactured a dangerously defective drug called Quadrigen and tested it improperly before releasing it to the public. Here, Janet Vincent comes along and complains of serious injury following her own use of Quadrigen. She sues Parke Davis and claims that Parke Davis, by virtue of the Tinnerholm case, cannot now deny it defectively manufactured and marketed Quadrigen. She says that Parke Davis is collaterally estopped from that denial by the prior finding in the Tinnerholm case.
In response to various applications and motions, this court ruled before and during the trial that a collateral estoppel did exist against Parke Davis with respect to issues of defective manufacture and testing. Specifically, we ruled that Parke Davis was estopped to deny these two points: (1) Quadrigen, as manufactured and distributed by Parke Davis, was defective in that the preservative Phemerol was unstable and caused a leakage of endotoxins from the Pertussis vaccine into the entire fluid; (2) Parke Davis failed to adequately test Quadrigen in the face of evidence that the product was unstable before releasing it onto the retail market.
*1031 The issues of whether Quadrigen was the cause of Janet’s injury, and the extent of her damages, were left for the jury. They found that it did and awarded a verdict of $300,000.
This memorandum will explain the court’s reasoning.
OUTLINE SUMMARY
I. The New York Doctrine of Collateral Estoppel — In General.
A. Identity of Issue and Prior Full and Fair Opportunity to Litigate.
B. No Requirement of “ Mutuality ”.
C. “ Offensive ” Use of Collateral Estoppel.
D. Collateral Estoppel Not Limited to "Vehicular Accident Cases.
1. Multi-Claimant Aspect of Collateral Estoppel Invites Its Application to Widely Sold Drugs Which are Defectively Made.
2. Principle and Policy of the Doctrine Control Its Application.
II. The Case of Janet Vincent and Her Father.
A. Defective Manufacture and Improper Testing of Quadrigen.
B. Issues Litigated.
IH. The Prior Case — Tinnerholm v. Parke Davis S Company.
IV. For Collateral Estoppel in Product Liability Cases, the Elements of Defective Manufacture and Causation of the Injury Can be Separated.
V. Identity of the Issues Between Vincent and Tinnerholm — Defective Manufacture and Testing.
VI. Full and Fair Opportunity to Litigate Previously.
A. The Realities of Litigation — Nine Specific Elements Cited by Court of Appeals.
1. Size of Claim.
2. Forum of Prior Litigation.
3. Use of the Initiative.
4. Extent of Litigation.
5. Competence and Experience of Counsel.
6. Availability of New Evidence.
7. Indication of a Compromise Verdict.
8. Differences in Applicable Law.
9. Foreseeability of Any Future Litigation.
B. No Rigid Limitations to This Flexible Instrument of Justice.
VII. The General Good of Collateral Estoppel and Its Particular Desirability Here.
*1032 I. THE NEW YORK DOCTRINE OF COLLATERAL ESTOPELE-IN
GENERAL.
Many lawsuit losers would undeniably prefer to start over again and. have another opportunity of winning. But, wisely, through the use of res judicata, the law prevents them from relitigating the same cause of action against the same adversary once there has been a decision on the merits.
Actually, res judicata is a Latin phrase meaning that a thing has been decided. In its most universal form, res judicata is a finding that as between the parties to a case (and those Bearing certain relationships to them) and concerning everything reasonably germane to that case which they had a chance to litigate, their ease is over and the decision reached stands. Such a notion is, of course, indispensable to the law. Otherwise, litigation of the same cause could go' on endlessly.
However, suppose one adversary is different, or the cause of action is different, but the identical issue has been decided before. Here, the courts have extended from res judicata, under carefully enunciated safeguards, a discretionary doctrine of 1 ‘ collateral estoppel ” to prevent a party from raising in a present action any issue that was necessarily decided against him in an earlier one. (See Rosenberg, Collateral Estoppel in New York, 44 St. John’s L. Rev. 165.)
Certainly, there are limitations on the use of this doctrine. 'But, with an eye on putting litigated issues to final rest, and a sensitive ear to fairness to all concerned, the courts in New York ' and nationwide have been expanding the doctrine and stretching those limitations.
A. THE NEW YORK RULE-IDENTITY OF ISSUE AND PRIOR FULL AND
FAIR OPPORTUNITY TO LITIGATE.
The Court of Appeals tells us that there are only two necessary requirements for collateral estoppel. These are identity in the latter case of issues necessary and decisive to the earlier one, and previous full and fair opportunity to litigate them.
In Schwartz v. Public Administrator of County of Bronx (24 N Y 2d 65, 71), it is specifically stated: “ New York Law has now reached the point where there are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.”
*1033 B. NO REQUIREMENT OF ‘1 MUTUALITY ’
Subject to small exceptions based on relationship, under our law a party is never bound by a case unless he was a party to that case. From this, it was once thought unfair to permit a party who was not bound by a prior case to take advantage of that ease. This view supported the old doctrine of 1 ‘ mutuality ’ ’, preventing one from asserting a decided issue in a prior case to a subsequent case, unless he too was bound by that prior case.
“Mutuality”, however, has been squarely rejected in New York. For collateral estoppel purposes, it is enough for the resisting party to have had in the controlling case the identical issue before him and full and fair opportunity to litigate it. (B. R. DeWitt, Inc. v. Hall, 19 N Y 2d 141.)
Accordingly, the policy of curtailing repetitive litigation prevails over mutuality’s claim to a facade of fairness. The notion is not new. As venerable and classical a commentator as Jeremy Bentham implied that the concept of ‘ ‘ mutuality ’ ’ in collateral estoppel permitted a losing party to litigate the same issue over and over against different parties in hopes each time of a different result. Bentham characterized “ mutuality ” as “ a maxim which one would suppose to have found its way from the gaming-table to the bench ”. (7 Works of Jeremy Bentham 171 [Bowring ed., 1843].)
It is then not necessary that the party asserting the estoppel has been a party to the prior action which gives rise to the estoppel.
0. 11 OFFENSIVE ’ ’ USE OF COLLATERAL ESTOPPEL.
Historically, collateral estoppel has found its greatly preponderate use in parties defending themselves in one case by citing the findings of a prior case. That is called a “ defensive ” use.
However, it is now well settled that the doctrine may be used “ offensively ” as well. (B. R. DeWitt, Inc. v. Hall, 19 N Y 2d 141, supra.) This means that an attacking party, can use the finding of a prior case to support his affirmative thrust in the later case. He can prevent his opponent from defending a point by estopping him with the collateral action.
Combining the permissibility of “offensive” use with the elimination of a mutuality requirement, we come to the case at hand. Janet Vincent and her father were not parties to another case which defendant Parke Davis lost, but they seek here to base their case in significant part on the decided issues of that earlier case.
*1034 D. COLLATERAL ESTOPPEL NOT LIMITED TO VEHICULAR ACCIDENT CASES.
In view of the sweeping language and doctrines just described, the section heading may seem naive.
Yet, the common law is not known for radical departure.. And, sometimes the eloquence of one context is later rued in another. The bulk of the collateral estoppel cases seems to involve multiclaimants in vehicular accidents. The opinions in some of them address policy considerations of accident litigation. The Schwartz (24 N Y 2d 65, supra) case itself involved a suit between the drivers of two ears involved in an accident where both drivers had previously suffered a verdict in an earlier suit brought against both by a passenger.
The case at bar does not involve a vehicular accident. Instead, it touches a serious claim of defective manufacture and negligent testing of a biological compound which was sold and used nationally. Predicated on the New York case authority of collateral estoppel, and pursuant to the reason and policy considerations which underlie it, commensurate with the interests of justice, we held that Janet Vincent and her father could assert a collateral estoppel against Parke Davis.
We ruled to that effect on pretrial application in guiding the attorneys in their opening statements to the jury. We ruled similarly in denying various trial motions by Parke Davis.
1. MULTI-CLAIMANT ASPECT OF COLLATERAL ESTOPPEL INVITES ITS APPLICATION TO WIDELY SOLD DRUGS WHICH ARE DEFECTIVELY MADE.
The base lines of collateral estoppel are the elimination of repeated litigation and the consistency of justice.
While most cases or commentaries on the subject deal with auto, bus, train, or airplane accidents where many people are injured in one actionable occurrence, this does not preclude a resembling' pattern where there are defectively made or improperly tested drugs destined for wide public merchandising. As surely as the negligent vehicle operator does his fateful thing, the manufacturer of a defective product does his, to the injury of a class of people related by common use of an object.
Indeed, there is reason to suppose that drug consumers are entitled to added protection. Often when they turn claimant, they face a major corporate adversary with resources spread over the United States. Typically, they face a difficult technical case where all the complained of acts took place within the closed confines of the manufacturer. They are hard plaintiff *1035 cases to prove for reasons of economics, access, and technicality. (Cf. Jerry v. Borden Co., 45 A D 2d 344; Blonder-Tongue v. University Foundation, 402 U. S. 313.)
Fairness suggests that when a victim proves the identical issue in an adequate forum where the drug manufacturer had full and fair opportunity to defend, the result should stick. Offending manufacturers should not easily have the ability to fight from forum to forum, and, with fresh litigative fortuities grind down claimants of lesser resources.
Recognition of the advantage held by parties with great resources and tactical advantages (see Hollister, Law Services in Nassau County: Neighborhood Advocates Under Attack, 20 Nassau Lawyer 281) is part of the reason to cut down on repetitive litigation.
2. PRINCIPLE AND POLICY OP THE DOCTRINE CONTROL ITS APPLICATION.
At least four landmark cases expanding the doctrine of collateral estoppel were not accident cases at all. Justice Traynor’s classic decision in Bernhard v. Bank of Amer. Nat. Trust & Sav. Assn. (19 Cal. 2d 807) involved an estate accounting, Israel v. Wood Dolson Co. (1 N Y 2d 116), an action for real estate brokerage commission, Zdanok v. Glidden Co., Durkee Famous Foods Div. (327 F. 2d 944), an employee’s action for relocation rights, and Blonder-Tongue v. University Foundation (402 U. S. 313, supra), a claim of patent infringement.
From these diverse fact patterns, it follows that it is the principle of the doctrine which controls its application, not the fact pattern of particular cases. It is not restricted to certain types of causes of action.
II. THE CASE OP JANET VINCENT AND HER FATHER.
This case began in 1961. After some changes of lawyers and defendants, it proceeded to trial against Parke Davis, manufacturer of Quadrigen, and treating doctor, Ralph B. Thompson.
It seems that on June 27, 1960, Janet, then named 'Smith and age 13, went to Dr. Thompson for a foot injury sustained the day before when she stepped on a nail. According to the jury finding, Dr. Thompson injected her with Quadrigen, a multipurpose vaccine affording immunization against diphtheria, tetanus, pertussis (whooping cough) and poliomyelitis. Following her sessions with Dr. Thompson and the injection, Janet "became acutely ill with numbness and paralysis throughout her body, became hospitalized, and was ultimately diagnosed by *1036 other doctors as having transverse myelitis. The after effects were serious, and her suffering and resulting harm were and remain grievous.
A. DEFECTIVE MANUFACTURE AND IMPROPER TESTING OF QUADRIGEN.
Quadrigen is a “ 4 in 1 ” vaccine manufactured by Parke Davis. It was first placed on the market in June, 1959 as a presumed advancement over the then existing Triogen containing only the basic three immunizations against diphtheria, pertussis, and tetanus, but lacking the fourth against polio. However, the polio vaccine added to the trivalent in order to create the “ 4 in 1 ” effect, was adversely affected by the preservative used in Triogen, so a new preservative had to be found. Parke Davis settled on benzethonium chloride, marketed under the brand name of Phemerol.
Before the commencement of their trial, the plaintiffs applied to have the doctrine of collateral estoppel invoked against Parke Davis in that Tinnerholm (285 F. Supp. 432) had definitely established that it had defectively manufactured and improperly tested Quadrigen before marketing. The court ruled that as to the defective manufacture and the improper testing, there was a collateral estoppel against Parke Davis.
Because Dr. Thompson was not a party in Tinnerholm, the collateral estoppel could not apply to him, and the estoppel was declared from the outset only against Parke Davis. The jury was so instructed. However, at no time did Dr. Thompson seek to offer any evidence or disputation with respect to defective manufacture or negligent testing of Quadrigen or to his knowledge of the product. His defense was essentially that he did not use Quadrigen, and that in all other respects he engaged in proper medical practice.
B. ISSUES LITIGATED.
The issues eventually put to the litigative test were whether Quadrigen was in fact used, whether it caused the injury, the propriety of Dr. Thompson’s professional conduct, and damages.
The court submitted to the jury a number of special questions, and on the consequent findings, Janet received an award of $300,000. By virtue of a Dole-Dow allocation, Parke Davis was charged with 60% and Dr. Thompson with 40%.
By stipulation, Mr. Smith wound up with an $8,211.30 judgment for medical expenses. This was against Dr. Thompson only because the Statute of Limitations protected Parke Davis who was served much later than the doctor,
*1037 in. THE PRIOR CASE-TINNERHOLM V. PARKE DAVIS & COMPANY.
Timterhqlm was started in 1962 and tried in November and December of 1967 without a jury in the United. States District Court, Southern District of New York, before Judge Tenney.
Three-month-old Eric was injected with Quadrigen on November 28, 1959. He developed a sustained high fever up to 108°, became hospitalized, had seizures, was partially paralyzed, and ultimately suffered brain damage, which permanently left him in the imbecile-idiot range of mental development. These injuries were claimed to have resulted from a defect in the Quadrigen, which released endotoxins into Eric’s body.
After a nonjury trial that lasted 14 days, plus several days taking trial depositions in other cities, and with expert witnesses presented by both sides, Judge Tenney rendered a comprehensive written decision. He expressed these findings:
1. “ The proof amply sustained the fact that Quadrigen was defective and that the defect was the proximate cause of the injury sustained by Eric Tinnerholm.” (285 F. Supp. 432, 444.)
2. ‘ ‘ The 1 defect ’ involved was * * * the leakage of endotoxins from within the bacterial cell ” (p. 445).
3. “ The benzethonium chloride had an unusual effect on the pertussis vaccine contained therein. It appears that there was a loss of potency, a reduction in the protective activity of the pertussis vaccine when benzethonium chloride rather than merthiolate was used as the preservative, which loss occurred only when the vaccine was exposed to variations in temperature * * * [T]he effect of the use of benzethonium chloride was to release the endotoxin from the bacteria [pertussis] cell into the fluid that was injected ” (p. 439-440).
4. Parke Davis “ breached its warranty of merchantability ” (p. 446).
5. Parke Davis ‘ ‘ is chargeable with negligence in failing to adequately test its product, for thereafter releasing the product for commercial distribution in the face of certain danger signs emanating from the test results, and in failing to adequately warn the medical profession of the risks inherent in its use * # * Parke-Davis in its rush to commercialization of its product either overlooked or neglected to consider the possibility that Quadrigen was too unstable a vaccine and therefore too unpredictable to be released on the market at that, time ” (pp. 446, 448).
6. ‘ ‘ Fully realizing [that doctors would prefer to give two shots — a trivalent plus a polio — rather than subject their *1038 patients to the needless risk of Quadrigen], Parke-Davis, employing the technique of ambiguity and a shrewd use of descriptive adjectives, was able to gloss over those facts which would have dissuaded the doctors and dispensaries from using their product, thereby lulling the medical profession into a false sense of security ” (p. 451).
Judge Tenney cited and discussed Stromsodt v. Parke-Davis & Co. (257 F. Supp. 991), also a nonjury case, in which an infant had been injected with Quadrigen in October 1959, and then suffered seizures and severe brain and central nervous system damage. The Stromsodt court found that Quadrigen had been marketed with a defect emanating from the Pertussis component and with inadequate testing, thereby causing the infant’s injury. An award, of $500,000 was made there.
Judge Tenney awarded a total of $610,000 to Eric Tinnerholm and $40,783.52 to his father.
Parke Davis appealed the Tinnerholm judgment to the Second Circuit. That court unanimously affirmed the finding that “ ‘ Quadrigen was defective and that the defect was the proximate cause of the injury sustained by Eric Tinnerholm ’ ”, (411 F. 2d 48, 53.) The court upheld the imposition of liability for breach of an implied warranty of merchantability and found it unnecessary to review the alternate theories of negligence employed by the court below.
IV. FOR COLLATERAL ESTOPPEL IN PRODUCT LIABILITY CASES, THE ELEMENTS OF DEFECTIVE MANUFACTURE AND CAUSATION OF THE INJURY CAN BE SEPARATED.
It was stipulated by all parties that there was no difference in manufacture and testing of Quadrigen as between Tinnerholm and Vincent. In other words, the situation of manufacture and testing was identical on the applicable dates of both Tinnerholm and Vincent. That is undisputed.
The differences in the lawsuit here stemmed from the questions of whether Quadrigen was in fact used, whether it contributed to the injuries, and the extent of damages.
Quadrigen, defectively manufactured and inadequately tested, was common to both cases. According to the triers of fact, it caused brain damage to Eric Tinnerholm and transverse myelitis to Janet Vincent. This difference in consequence does not prevent the application of collateral estoppel to the issues of Parke Davis’ defective manufacture and negligent testing. These acts of improper conduct were necessary elements of the successful Tinnerholm cause of action and are decisive of those issues here.
*1039 It is not necessary that the separate issues of causation and damages be also foreclosed; these may be separately litigated. As demonstrated in section v immediately below, the causation issue here is a separate sequential element. By definition, collateral estoppel can be applied to less than all of the elements that comprise a given cause of action.
When used “defensively”, collateral estoppel bars one essential element of a cause of action and thereby bars the whole cause. (Israel v. Wood Dolson Co., 1 N Y 2d 116, supra.) In the typical “ offensive ” use case, the element of damages is separated from those where estoppel applies. There is no reason why other elements cannot be similarly situated.
In a bus accident, for instance, where there is negligence by the driver which caused the accident, is there any less estoppel on the negligence issue because in measuring contribution to the injury one passenger had a previous bad back, another was standing improperly on the exit step, and another was leaning outside the window?
Indeed, the essence of collateral estoppel is that less than all of the previous case is before the second court. If the cases were the same, it would be a simple res judicata. Moreover, elimination of ■“ mutuality ” and allowance of “ offensive ” use necessarily implies there are some different elements in the cases. Strangers bring different consequences to a particular issue, the questioning of which is estopped by prior litigation.
V. IDENTITY OF THE ISSUES BETWEEN VINCENT AND TINNERHOLM-
DEFECTIVE MANUFACTURE AND TESTING»
The claim here, as in Tinnerholm, is.that Quadrigen is unstable in its Pertussis component, that the preservative Phemerol caused a leakage of poisonous elements, and that the improperly tested drug was publicly released in face of signs of danger. To this extent, the issues are absolutely identical.
They are not made less so by the fact that injections of the identical badly made and badly tested vaccine were later given to different children under different circumstances. These simply go to the balance of the case, the issues of causation and damages.
The law is settled in this State that where a drug is defectively made, and that drug is the proximate cause of an injury not to be anticipated from a properly prepared product, the manufacturer is liable in damages. (See Codling v. Paglia, 32 N Y 2d 330; Twerski, Prom Codling, To Bolm To Velez: Triptych To Confusion, 2 Hofstra L. Rev. 489.)
*1040 Parke Davis argued repeatedly that the issues of defective product and causation were so intertwined they could not be separated, and so there could be no collateral estoppel here. However, the naked argument of intertwining was its totality of presentation. Nothing was offered or proven which in any way substantiated the claim, nor even what the argument really meant. In fact, the subsequent conduct of the trial showed the issues of defective product and causation were related only sequentially. Expert witnesses for both sides were able to address these issues separately without difficulty.
The Uniform Commercial Code deals with them separately (§§ 2-314, 2-715), and we instruct juries on them as separate issues (PJI 2:140 et seq. and PJI 2:70 et seq.).
Concern about intertwining may have some validity in cases where the act of negligence and the suffering of harm virtually coincide in place and time. But, here, where the creation of the defect occurred miles and years away from Janet’s infliction, such concern must be depreciated. In any event, Parke Davis’ major trial thrust was that transverse myelitis could in no way result from Quadrigen, the antithesis of intertwining.
VI. FULL AND PAIR OPPORTUNITY TO LITIGATE PREVIOUSLY.
Has Parke Davis demonstrated it did not have a full and fair opportunity to be heard in Tinnerhohni
Schwartz (24 N Y 2d 65, supra) and DeWitt (19 N Y 2d 141, supra) establish that it has that burden here, yet it did nothing to meet it. More than that, the facts are plain that Parke Davis did have such a full and fair opportunity.
In Schwartz (24 N Y 2d 65, 72) the Court of Appeals explained that full and fair opportunity in a prior action ‘ ‘ requires an exploration of the various elements which make up the realities of litigation.” It ticked off nine headings which would be included in a comprehensive list of factors in weighing the doctrinal applicability.
A. THE REALITIES OF LITIGATION-NINE SPECIFIC ELEMENTS CITED
BY COURT OF APPEALS.
1. SIZE OF CLAIM.
In Tinnerhohn, the plaintiffs pressed a seven figure ad damnum. Considering the gravity of the injuries, and the precedential values, Parke Davis had more than adequate incentive to litigate long and, hard. Moreover, the judgment there of $651,783.52 against Parke Davis provided further motivation *1041 for thorough prosecution of the losing appeal to the Second Circuit Court of Appeals.
The ad damnum request here was for $1,050,000. The severe injuries stated here are, if anything, more modest than those in Tinnerholm. Certainly, no more reason for laxity in defense of Parke Davis existed in Tinnerholm than here. They were both major claims by lawyers’ standards anywhere.
2. FORUM OF PRIOR LITIGATION.
The Federal court in the Southern District of New York, which heard Tmnerholm, is by no means an inferior or less exalted court than the instant forum. There seem no discernable procedures there that would have made the litigation less exhaustive. Nor was there any meaningful factor of geographic inconvenience since Parke Davis is acknowledged to be sufficiently large with adequate resources to litigate anywhere in the country away from its home base in Detroit, Michigan.
The absence of a jury trial in Tinnerholm is not a prejudicial element since both there and here Parke Davis had a right to demand and obtain a trial by jury. That it chose not to do so reflects only its own strategic decision, not prejudice or unfairness.
3. USÉ OF THE INITIATIVE.
The initiative in both cases as well as the burden of proof falls upon the plaintiff. No distinction emerges here. In both cases, Parke Davis ’ need to win was compelling.
4. EXTENT OF LITIGATION.
The Tinnerholm case was an exhaustive tort litigation. Every conceivable opportunity was given to Parke Davis to offer proof on the issues presented, and to cross-examine or rebut plaintiff’s evidence.
Parke Davis appealed to the United States Court of Appeals for the Second Circuit and lost completely on the issue of defective manufacture and testing.
The Federal opinions in Tinnerholm were notably articulate and thorough in their analyses.
5. COMPETENCE AND EXPERIENCE OF COUNSEL.
The same excellent attorneys who litigated Tinnerholm for Parke Davis represent Parke Davis here. This court has had an opportunity to observe Parke Davis’ counsel firsthand and can *1042 but confirm their obvious skill and acumen which is also reflected in the Tinnerholm record.
No hint whatsoever emerges that Parke Davis’ counsel were in any way imposed upon by plaintiff’s able counsel in Tirnierholm.
6. AVAILABILITY OP NEW EVIDENCE.
A collateral estoppel can be vitiated upon a proper showing of the availability of new evidence. Here, Parke Davis made some effort to claim there was new evidence, but this fell far short of acceptable standards.
It first sought to introduce without foundation evidence of a ‘ ‘ literature search conducted by the library department of Parke Davis to establish what if any eases were associated with transverse myelitis ’ ’. Whereupon it would have had a Parke Davis microbiologist testify based on that collection of documents. However, the court indicated it would require, as a minimum foundation for considering the introduction of the literature search, the testimony of the supervising librarian. The point was never pursued further by Parke Davis.
At the end of its defense presentation, Parke Davis sought to establish through recalling Dr. Hodes, its eminent Nassau County pediatric specialist engaged as an expert witness, that there was a new and better test which showed the Quadrigen biological did not have the toxin leakage. Apparently, Dr. Hódes, who had been sitting in court, informed trial counsel of this test. He was furnished with one bottle of the vaccine and then claimed he found no poisonous leakage in that bottle. Based on this, Parke Davis asked the court to instruct the jury that there was now no collateral estoppel to the defective manufacture defense and to allow it to produce its evidence to this effect.
Parke Davis, under the court’s questioning, refused to ask for a mistrial so that a new jury could be empanelled who had not been advised of the collateral estoppel point. It insisted its motion was only to continue the trial with the old jury newly reinstructed. Quite apparently, Parke Davis saw no grievous prejudice in the previous mention of defective manufacture and testing. Conflicting instructions and prior judicial suggestion of Parke Davis impropriety were not enough to make it call for a mistrial. Was this not because it could not seriously contest the defective manufacture and testing and that its real case was that Quadrigen could not have caused Janet Vincent’s injuries? Because of the obvious potential prejudice to the plaintiffs in *1043 proving their case at this time after having proceeded on the collateral estoppel basis, this surprise motion short of n mistrial, in any event, had to be rejected.
But, even on the merits, the court found no substance in Parke Davis’ request. Dr. Hodes testified the new test, the Limulus test of Doctors Bank and Levin, went back to 1964 when he learned of it. The Limulus test is simple and can be performed in 15 or 20 minutes, and is commonly used in hospitals for the quick identification of meningitis. The test was apparently well known by 1968 when the Tinnerholm- case was tried, and Parke Davis then had every opportunity to take advantage of.it. The Parke Davis assistant director of quality control and government regulation testified that he personally first heard of that test three or four years ago. This did not lessen the prior availability to Parke Davis of the test, nor the litigative opportunities it has had. Nor did it preclude knowledge, actual or chargeable, by any Parke Davis doctor or other qualified research specialist.
Moreover, the eleventh hour (and a-half) offering involving only one uncertain bottle lacks the depth, substance, and good faith one expects from a serious scientific submission. This “ scientific” introduction was indeed generated in court by a local doctor retained only to testify, and was a result of counsel’s alertness, not Parke Davis’ research .staff. The whole skein of conduct speaks most eloquently to the poor performance qualities which overtook Parke Davis in Tinnerholm in the first place.
7. INDICATION OF A COMPROMISE VERDICT.
Judge Tenney’s opinion gave no indication of compromise, emotionality, or exaggeration of the proof.
The affirmance by the Second Circuit, which articulated a thorough analysis of the proof at trial, is itself dispositive. The slight modification downward of the amount awarded as damages to the father for medical expenses paid (411 P. 2d 48, 54) does not weaken the affirmance of the holding against Parke Davis on liability.
8. DIFFERENCE IN APPLICABLE LAW.
Since Judge Tenney was bound under Erie R. R. Co. v. Tompkins (304 U. S. 64) to apply New York substantive law, there should be no difference in the applicable law used there and here. Moreover, in the time gap between the 1968 trial .of Tinnerholm and now, there has been no discernable change in New York product liability or warranty doctrines that would now prejudice Parke Davis. (Cf. Commissioner v. Sunnen, 333 U. S. 591.)
*1044 9. FORESEEABILITY OF ANY FUTURE LITIGATION.
Tmnerholm was commenced in 1962, well before its trial in 1968. In 1966, Parke Davis was joined in this áction of Janet Vincent. Moreover, the Stromsodt (257 P. Supp. 991, supra) case was tried in 1966, before Tmnerholm. When it was trying Tmnerholm, Parke Davis had known for two years that Vincent was pending against it. Based on the previous loss in Stromsodt, and the overhang of Vincent, Parke Davis had to be alerted to prospects of substantial subsequent litigation when it was trying Tmnerholm.
B. NO RIGID LIMITATIONS TO THIS FLEXIBLE INSTRUMENT OF JUSTICE.
It must be remembered that like many other legal conceptions, collateral estoppel is a flexible instrument of justice. It is not to be applied rigidly. As indicated in Schwartz (24 N Y 2d 65, supra), the doctrine comes into play when the moving party shows the issue to be identical and necessarily decided, and then the burden shifts to the defending party to show he did not have his full and fair litigative opportunity. “ This apportionment of the burdens is both fair and necessary.” (24 N Y 2d 65, 73.)
The nine factors discussed above must be weighed by the court to determine if there was in fact the requisite full and fair prior litigative opportunity. And, there may be others which in balance may persuade a court to permit relitigation.
One is the presence of an anomalous result. Professor Currie, in his article, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine (9 Stan. L. Rev. 281), hypothesized this in the possible unfairness of a multiple litigation incident where 50 unrelated persons are injured and each sues the same defendant separately. The first 25 decisions go against each claimant. However, claimant number 26 wins. The remaining 24 claimants could conceivably use the one favorable result, the 26th, ignoring the 25 previous losers, to estop the defendant collaterally. But, this observation is not conclusive or even destructive of collateral estoppel. First, a court need not, under the circumstances, impose an anomalous result as an estoppel, but may act as the sense of the situation requires. Second, what assurance is there of greater justice by random trial throughout the remaining 24 cases, assuming the defendant had a full and fair opportunity in his 26th and losing trial? Even Professor Currie withdrew from his reservations later in Civil Procedure: The Tempest Brews (53 Calif. L. Rev. 25). Upon reflection, he noted that discreet application of collateral estoppel would minimize *1045 the unfairness he has feared, while permitting the use of collateral estoppel, as in the Bernhard case (19 Cal. 2d 807, supra), which he called: “ a shining landmark of progress in justice and. law administration”. (Currie, Civil Procedure, supra, p. 37.)
Here, we have weighed not only the nine factors of litigative reality, but also the consistent (not anomalistic) nature of the results, and find Parke Davis had in Tinnerholm the requisite full and fair prior litigative opportunity. There are absolutely no contradicting factors to such a conclusion.
VII. THE GENEBAL GOOD OF COLLATEBAL ESTOPPEL AND ITS PABTIOTTLAB DESIBABILITY HEBE.
In a litigation as complicated as this, the personal view that a Judge takes of the desirability of collateral estoppel is bound to affect his readiness to apply it. Those who dislike and distrust the doctrine can most certainly find a way to leave the path picked through this legal thicket.
Yet, the New York courts are committed to the sweeping application of collateral estoppel. The comprehensive language of the Court of Appeals in Schwartz (24 N Y 2d 65, supra) leaves no doubt as to this policy. Some of the strength of the New York commitment can be gleaned from Hart v. American Airlines (61 Misc 2d 41), an unappealed New York Supreme Court decision which has been well received. (Note, Collateral Estoppel in Multistate Litigation, 68 Col. L. Rev. 1590.) There, 58 people were killed in an airplane crash. The airline was found liable in the first lawsuit, which happened to be brought in a Texas Federal court. The New York court refused to let the airline relitigate the issue of liability in the subsequent suit here by other passengers, even though in Texas, which still recognizes the doctrine of 11 mutuality ’ ’, there could have been no collateral estoppel.
This is to the general good, for rules of reason and practical necessity underlie collateral estoppel. The increasing crush of litigation makes it mandatory that efficient use be made of the courts. Consistency and expedition are important to justice. Promiscuous recourse to renewed litigation is bound to have a selective effect quantitatively in advancing the cause of heavier endowed litigants.
Those who detract from the doctrine of collateral estoppel often fail to perceive its true force. They do not reckon with the conception that the time priority in litigative experience is necessarily inherent in res judfcata itself. That doctrine really means that an issue has already been decided once by a court of *1046 competent jurisdiction. (Cf. Graves v. Associated Transp., 344 F. 2d 894, 901.)
The court is well aware that the potential consequences of this result may be far-reaching. But, we should not shy away from a conclusion because it is so significant — justice itself is far-reaching.
The Tinnerholm-Vincent cases form the “school solution ” for “ offensive ” use by a plaintiff of collateral estoppel. If it cannot be used here against Parke Davis, it cannot be used in any products liability case involving medically administered drugs. The pertinent issues are identical. There could not have been a fuller and fairer prior litigative opportunity — Federal courts in New York, Erie-TompJcms kissing cousins of the New York common law . . . not the boondocks . . . powerful incentives in Parke Davis to win each time . . . same lawyers for Parke Davis in both cases. Parke Davis had previously lost not only in Tinnerholm, but also in Stromsodt. Parke Davis, a major corporation, did the complained acts in the seclusion of its own premises. The evidence, particularly with regard to testing, showed an appalling Parke Davis indifference to the consequences of its conduct. Now, on the manufacture and testing issues, it is seeking to relitigate, twisting and squirming, hoping to snatch somewhere a favorable result from the hands of a relatively disadvantaged consumer. Justice is not about that!